**BUCKEYE STATE MUTUAL
INSURANCE COMPANY,
Appellant–Plaintiff,**

v.

**Keith CARFIELD and Jean E. Mohr, Individually and as Administratrix of the Estate of Bruce A. Mohr, Deceased, Appellees–Defendants.**

**No. 70A04–0902–CV–95.**

Court of Appeals of Indiana.

Oct. 7, 2009.

---

Matthew J. Elliott, Beckman Lawson, LLP, Fort Wayne, IN, Attorney for Appellant.

W. Scott Montross, Montross Miller Muller Mendelson & Kennedy, Indianapolis, IN, Attorney for Appellees.

**OPINION**

RILEY, Judge.

*STATEMENT OF THE CASE*

Appellant–Plaintiff, Buckeye State Mutual Insurance Company (Buckeye), appeals the trial court's Findings of Fact and Conclusions in Law in favor of Appellees–Defendants, Keith Carfield (Keith) and Jean E. Mohr, Individually and as Administratrix of the Estate of Bruce A. Mohr, Deceased, on Buckeye's Complaint for Declaratory Judgment concerning coverage in a wrongful death action.

We affirm.

## ISSUE

Buckeye raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred in concluding that Keith was entitled to coverage under an insurance policy issued by Buckeye, his insurance carrier, because the truck involved in the accident was furnished or available for his regular use.

## FACTS AND PROCEDURAL HISTORY

Keith and his father, Weldon Carfield (Weldon), are farmers, each farming approximately 600 acres on their respective farms. Although Keith and Weldon each have their own farms, they would help each other on the farms without compensation and they shared the farm equipment necessary to work both farms. Specifically, Weldon owned a combine, tractors and a planter that he shared with Keith, while Keith shared his sprayer with Weldon.

Sometime in 2001, Weldon purchased a 2001 Chevy Silverado to use as a farm truck. Both Weldon and Keith drove the truck to move from field to field, to transport equipment, to transport people, and to haul seed, tools, fuel, and fertilizer. The truck was available for Keith's use and he did not have to ask Weldon for permission to use the truck for farm purposes. However, any use of the vehicle by Keith was almost exclusively during the spring planting period and the fall harvest period. Although the length of each respective season was variable due to the weather, Keith and Weldon spent on average twelve days farming during the spring season, while they spend approximately fifty days farming during the fall season. The few times Keith kept the Silverado overnight at his farm, he had driven it directly from the fields to his home at the end of the day. At all times, the keys were left in the truck; Keith did not have his own set of keys.

On October 9, 2004, Keith was involved in a car accident while driving the Silverado. The other driver in the accident, Bruce Mohr, was killed. At the time, the Silverado was insured by Weldon. The truck was not listed on Keith's auto liability insurance policy with Buckeye and was not a "covered auto" pursuant to the policy. On October 4, 2006, Buckeye filed a Complaint for Declaratory Judgment requesting the trial court to declare that Keith is not entitled to coverage under the insurance policy. In relevant part, Keith's policy provides as follows:

**EXCLUSIONS**

B. We do not provide Liability Coverage for the ownership, maintenance or use of:

. . .

2. Any vehicle, other than "your covered auto," which is

a. . . .

b. Furnished or available for your regular use.

(Appellant's App. p. 109).

On January 6, 2009, a bench trial was conducted. Thereafter, on January 27, 2009, the trial court issued its Findings of Fact and Conclusions of Law, concluding that the Silverado was not furnished to or available for Keith's regular use. Consequently, as the policy exclusion was not applicable, the trial court found Keith was entitled to coverage under his policy with Buckeye.

Buckeye now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Buckeye contends that the trial court erred when it concluded that Weldon's truck was not furnished to or available for Keith's regular use pursuant to the exclu-

sion language found in the insurance policy. In the instant case, the trial court entered findings of fact and conclusions of law. Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings and second, we determine whether the findings support the judgment. *Boonville Convalescent Ctr., Inc. v. Cloverleaf Healthcare Servs., Inc.,* 834 N.E.2d 1116, 1121 (Ind.Ct.App.2005), *reh'g denied, trans. denied.* Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In determining whether the findings on the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

■■■ Insurance policies are governed by the same rules of construction as other contracts. *Briles v. Wausau Ins. Companies,* 858 N.E.2d 208, 213 (Ind.Ct.App. 2006). As with other contracts, the interpretation of an insurance policy is a question of law. *Id.* When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Id.* We construe the insurance policy as a whole and consider all of the provisions of the con-

tract and not just the individual words, phrases or paragraphs. *Id.* If the language is clear and unambiguous, we give the language its plain and ordinary meaning. *Id.* An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *Id.* However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language. *Id.*

■■■ In essence, Buckeye requests us to interpret the insurance policy's "furnished or available for ... regular use." (Appellant's App. p. 109). We have previously examined the phrases "furnish" and "regular use" in *Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 223 (Ind.Ct.App.1997). Utilizing dictionary definitions, the *Smith* court defined "furnish" as "to provide with what is needed, ... supply, give" and "regular" as "recurring, attending, or functioning at fixed or uniform intervals ... constituted, conducted or done in conformity with established or prescribed usages, rules or discipline." *Id.* Applying these definitions to the situation before it, the *Smith* court found that driving a vehicle six nights a week in the scope of a newspaper delivery job constituted regular use and thus fell within the coverage exception. *Id.*

Here, the record reflects that during the years 2001–2004, the Silverado was considered to be the farm truck, used by both Weldon and Keith. The truck was used to move equipment from field to field, to get Keith and Weldon to and from the field, and to haul farm materials. As with all the other heavy farm equipment, they shared the truck during the planting and harvesting season and drove it to both farms. Depending on who was driving the farm equipment, the other person would be driving the truck. In this light, Keith testified that "[w]hen [I] say the truck was

used, [Weldon] might have been the one who was driving it." (Transcript p. 39).

Ignoring the weather, Keith stated that the truck would be used approximately twelve days in the spring to plant the crops and approximately fifty days in the fall to harvest them. "And during that time, it may be [Weldon] or it may be [me] using it, just depending on who's behind the combine and who's doing the chauffeuring." (Tr. p. 41). Accordingly, there were an aggregate sixty-two days per year that Keith "might" be driving the truck. The few times Keith kept the Silverado overnight at his farm, he had driven it directly from the fields to his home at the end of the day. At all times, the keys were left in the truck; Keith did not have his own set of keys.

Although the facts before us indicate that there was a clear periodic use of the Silverado by Keith, we agree with the trial court that this does not reach the level of consistent, regular use called for under the policy's exclusion. Because the vehicle is a farm truck, twice yearly and for a limited time, the vehicle would be used on Keith's fields. However, depending on who was driving the heavy farm equipment, Keith or Weldon would be driving the truck. Thus, even during these sixty-two days that the truck was available for Keith's use, it was not furnished to him nor did he drive the Silverado on a routine or recurring basis. Therefore, we find that the exclusion does not apply and Keith is entitled to coverage under Buckeye's policy.

### CONCLUSION

Based on the foregoing, we find that the trial court properly concluded that Keith was entitled to coverage under an insurance policy issued by Buckeye, his insurance carrier, because the truck involved in the accident was not furnished or available for his regular use

Affirmed.

FRIEDLANDER, J., concurs.

BAKER, C.J., dissents with separate opinion.

BAKER, Chief Judge, dissenting.

I respectfully dissent. The undisputed evidence at trial established that the Silverado was a farm truck used primarily during farming season, which lasted for approximately twelve days in the spring planting season and fifty days in the fall harvesting season. During both seasons, Carfield used the truck every day. The trial court found that "[t]he truck was available for [Carfield] whenever he needed it for farm use" and that Carfield "did not have to ask Weldon's permission to use the truck for farm purposes." Trial Ct. Order p. 16.

I believe that both the trial court and the majority split hairs by concluding, based on these facts, that although the truck was "available" to Carfield during the farming seasons, it was not "available" for his "regular" use because he did not generally use it outside of those two seasons. This truck was a farm truck, to be used for farming purposes. Its primary usefulness occurred during the farming seasons, and during those seasons, Carfield used it every day. In the off seasons, Carfield continued to use it, albeit less frequently. He did not need to ask permission to use it, he changed the truck's oil, and the vehicle spent the night at his house more than ten times. I believe that his recurring use of the truck over a period of four years, including heavy usage during the farming seasons, constitutes "regular" use. Therefore, I would reverse.