**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANTS:

**ANDREW L. TEEL**
**TRAVIS S. FRIEND**
Haller & Colvin, P.C.
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**ELIZABETH M. BEZAK**
Burke Costanza & Carberry LLP
Merrillville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PATRICIA A. HAMPTON and JOSEPH A. HAMPTON, individually as husband and wife; LAURA MARCIANO and NICHOLAS JAKOS, individually, and as parents and/or legal guardians of GENEVIEVE JAKOS, a minor child, | ) ) ) ) ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 02A04-1310-PL-509 |
| METROPOLITAN PROPERTY and CASUALTY INSURANCE COMPANY, | ) ) ) ) | |
| Appellee-Plaintiff. | ) ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Stanley A. Levine, Judge
Cause No. 02D01-1210-PL-369

**February 11, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

In this case, appellee-plaintiff Metropolitan Property and Casualty Insurance Company (Metropolitan) issued a homeowner's insurance policy to Patricia and Joseph Hampton (collectively, "the Hamptons"). Exclusions under the policy included provisions that Metropolitan would not cover losses that arose from "business activities" or from the "regular care" of a person for "economic gain." However, the policy exclusions did not apply to occasional care or babysitting.

Patricia, a stay-at-home mom who had two young children of her own, agreed to provide childcare on a regular basis to the appellants-defendants Laura Marciano's and Nicholas Jakos's (collectively, "the Parents") minor daughter, Gen, at a cost of $20 per day while the Parents were at work. In February 2012, Gen rolled off the Hamptons' bed and was severely injured.

Metropolitan sued for a declaratory judgment and ultimately moved for summary judgment, claiming that the exclusions mentioned above applied in this circumstance, and the Hamptons had no coverage for Gen's injuries as a matter of law. The Hamptons also moved for summary judgment, arguing that there were no genuine issues of material fact, that the exclusions under the policy did not apply, and that they had coverage under the policy.

2

The trial court granted Metropolitan's motion for summary judgment. We affirm and conclude that coverage was excluded under both the "business exclusion" and the "care of persons exclusion" under the homeowner's policy.

FACTS

The Hamptons live in Fort Wayne and have two daughters. Juliana was born on February 6, 2008, and Savannah was born on March 23, 2011. Patricia quit her job at Easter Seals after Savannah was born and decided to stay home. The Parents and their child, Gen, who was born on June 24, 2011, also live in Fort Wayne.

Laura and Joseph were co-workers at Lincoln Financial Advisors. In March 2011, when Laura was pregnant, Joseph approached her and said that Patricia could watch the baby because she had decided to stay at home with their children.

The Parents and the Hamptons reached an agreement for Patricia to provide childcare to Gen. Patricia began providing daycare to Gen in August 2011, when Gen was approximately eight weeks old. The Parents provided the necessary supplies for Gen's care, including diapers, wipes, cream, extra clothing, and bottles.

There was no agreement as to how long the arrangement would last or when it would end. Rather, the parties kept the arrangement "open ended." Appellant's App. p. 95. Although the number of days that Gen stayed with Patricia "varied from week to week," Patricia provided care to Gen for approximately six months. Id. at 49-50. The specific days were determined as the weeks approached, but Patricia was paid a daily rate of $20 to watch Gen on a "weekly basis." Id. at 214. The Hamptons determined that $20

3

per day was a fair rate because that was the amount they had paid for their oldest daughter to be cared for at a "home daycare" when she was three months old. Appellant's App. p. 70-71.

Patricia typically cared for Gen Monday through Friday during the six-month period. The Parents understood that the agreement called for Patricia to provide care to Gen on a regular basis, "every day," Monday through Friday, five days a week or Monday through Thursday, with a few exceptions. Appellant's App. p. 120-21.

More particularly, Patricia provided care to Gen when the Parents were working. For instance, because Laura worked four days per week in September 2011, Patricia provided care for only four days per week during that month. And sometimes, Patricia would care for Gen only three days out of the week. Joseph acknowledged that Patricia provided care to Gen "a fair amount of times," either four or five days per week from August 2011 through February, 2012. Id. at 67.

Jakos would typically drop off Gen in the morning at the Hamptons' residence between 7:00 and 7:30 a.m. Although the pick-up times varied, the Parents typically arrived at the Hamptons anywhere from 4:30 to 5:00 p.m. The $20 daily rate was paid regardless of how many hours that Patricia cared for Gen. The Hamptons generally received cash payments every other week. The Hamptons received a total of approximately $1900 over a six-month period, and these funds were used to purchase wipes, diapers, and to pay a portion of the utility bills.

4

Metropolitan issued a homeowner's policy to the Hamptons for their Fort Wayne residence, with effective dates of coverage from January 29, 2012, through January 29, 2013.

The policy included the following "General Definitions" section:

> "Business" or "business purposes" means:
>
> > 1. any full or part time activity of any kind engaged in for economic gain, and the use of any part of any premises for such purposes.
> >
> > . . .
>
> "You" and "your" mean:
>
> > 1. The person or persons named in the Declarations and if a resident of the same household:
> >
> > > a. the spouse of such person or persons. . . .

Appellant's App. p. 128. The policy also included the following provisions:

**SECTION II – LOSSES WE COVER**

**COVERAGE F – PERSONAL LIABILITY**

> **We** will pay all sums for bodily injury . . . to others for which the law holds **you** responsible because of an **occurrence** to which this coverage applies. . . .
>
> **We** will defend **you,** at **our** expense . . . against any suit seeking these damages. . . . **We** are not obligated to defend any claim or suit seeking damages not covered under the policy.

Id. at 128 (emphases in original).

. . .

**SECTION II – LOSSES WE DO NOT COVER**

**COVERAGE F – PERSONAL LIABILITY AND COVERAGE G – MEDICAL PAYMENTS TO OTHERS**

. . .

> **4. Business.  We** do not cover **bodily injury** . . . arising out of or in connection with **your business** activities . . . .

Id. at 128-29.

> **5.  Care of Persons.  We** do not cover **your** legal liability to any person resulting from **your** regular care of one or more persons anywhere for economic gain and regardless of whether such care or premises is licensed or not.  The mutual exchange of home day care services is not considered to be for economic gain.  This exclusion does not apply to **your** occasional care or babysitting.

Id. at 129.

Approximately seven weeks before Gen was born, Joseph informed Laura that Patricia was still interested in having his wife care for the baby, and explained that "[w]e have even gotten a quote on the additional homeowner's insurance so we can flip the switch when/if needed."  Appellant's App. p. 101.  Jakos was aware that the Hamptons would be obtaining quotes for additional homeowner's insurance that related to Patricia's care of the child.

Joseph spoke with his insurance agent when he and Patricia were considering providing child care in their home.  Joseph specifically recalled asking the agent "if two or three kids were in the house, would that be covered?"  Appellant's App. p. 76-77.  Joseph learned that "daycares would not work" and that he "couldn't run a business in

6

[his] home" with his current homeowner's coverage.  Id. at 74.  However, the Hamptons did not change their coverage "[s]ince [Mrs. Hampton] wasn't willing to have a licensed daycare with multiple children in the home."  Id. at 80.

Joseph initially testified that he did not "even think about" exploring what, if any, additional homeowner's coverage that he might require in connection with caring for Gen because "people babysit all the time and don't have special coverage."  Id. at 79.  However, after being confronted with a May 5, 2011, email that he sent Laura, Joseph acknowledged that he did not actually seek quotes for additional homeowner's insurance because neither he nor Patricia believed that babysitting Gen was a "child care business."  Appellant's App. p. 202.  Thus, the Hamptons' homeowner's insurance did not change from May 2011, through February 2012.

On February 16, 2012, Patricia placed Gen in one of the Hamptons' beds for a nap.  Patricia left Gen alone in the room to check on her own two children who were also at home.  When Patricia returned to the bedroom, she noticed that Gen was on the floor, crying.  As a result of the fall, it was determined that Gen suffered subdural hematomas, and blood vessels that had burst in and around the retinas of both eyes.  These injuries resulted in nerve damage to Gen's left eye, which prevented her from moving that eye past "midline" when looking to the left.  Appellant's App. p. 226.  As a result, Gen underwent six months of treatment for her injuries.

Patricia last provided care to Gen "somewhere around the 20th or 21st of February, 2012."  Id. at 122-23.  The arrangement for Patricia to provide care to Gen

7

ended after Gen was taken to Riley Hospital and Laura received information about Gen's injuries from the medical providers.

Prior to the February 16 incident, Laura intended to continue the childcare arrangement with Patricia. The amount of compensation remained the same through February 2012. On February 23, 2012, Laura informed Patricia via email that she would be paid "$80 for last week and $30 for this week." Appellant's App. p. 115. There was never a time that Patricia provided care to Gen for which she was not paid. In other words, the Hamptons received payment for all of the care provided to Gen in February 2012. Although Joseph did not believe that he and Patricia received payment for February 16, 2012, Joseph expected that Patricia would have been paid for that day and acknowledged that Patricia would have kept track of any money that the Parents owed.

The Hamptons admitted that the money the Parents paid them generated extra income, and no additional expenses were incurred during the six month time frame that Patricia cared for Gen. The money received was used for the payment of expenses that the Hamptons incurred, including the costs of buying diapers for their own children and buying groceries.

On October 16, 2012, Metropolitan filed a declaratory judgment action against the Hamptons and the Parents, for a determination of legal obligations and rights, if any, that it had under the homeowner's insurance policy that it issued to the Hamptons regarding Gen's care. Metropolitan claimed that it had no defense or indemnification duties to the Hamptons for any claim that arose out of the February 16, 2012 incident with Gen.

8

On July 3, 2013, Metropolitan filed a motion for summary judgment, claiming that it had no duty under the policy as a matter of law when Gen was in Patricia's care in light of the specific exclusions in the policy. More specifically, Metropolitan asserted that the daily and weekly care provided to Gen over the six-month period for payment fell within the definition and scope of "regular" within the terms of the policy provisions. Appellant's App. p. 189. In other words, Metropolitan maintained that Patricia's care for Gen was not just "occasional care or babysitting." Id. at 188.

Metropolitan also argued in its motion that it did not provide coverage out of, or in connection with, the Hamptons' business activities. In other words, Metropolitan contended that caring for Gen on a day-in, day-out basis for compensation constituted a business activity within the meaning of the policy. Therefore, under the business activities exclusion, Metropolitan claimed that it was not required to cover the Hamptons in this instance because Gen's injuries occurred in connection with their business activity.

The Hamptons also moved for summary judgment, claiming that the business exclusion of the policy does not apply in these circumstances because the childcare was not "regularly and continuously [provided] for the purpose of earning a livelihood." Mid-American Fire & Cas. Co. v. Shoney's, Inc., 843 N.E.2d 548, 552 (Ind. Ct. App. 2006). Thus, the Hamptons argued that Metropolitan's position, "that the mere collection of money is sufficient to establish a business activity, is plainly incorrect." Appellant's App. p. 239.

9

The Hamptons further asserted that they never intended to open a childcare business. Rather, they claimed that Patricia was "simply doing a favor for someone with whom she worked rather than as a business enterprise requiring additional insurance coverage." Appellant's App. p. 9. The Hamptons repeatedly testified in their depositions that money was not a motivating factor in the decision to babysit Gen. The Hamptons argue in the alternative, first that they are entitled to summary judgment and then, if not, that there are genuine issues of material fact that preclude summary judgment for Metropolitan. The Hamptons asserted that Metropolitan cannot demonstrate that there was a profit motive regarding Patricia's care for Gen, and that she was not earning a living in doing so.

The designated evidence established that Patricia received approximately $2 per hour to babysit Gen, or approximately one-fifth of what she earned at her last job. Thus, the Hamptons maintain that no one could reasonably assert that such "paltry earnings" could constitute a "livelihood" in this day and age. Appellant's App. p. 240.

Following a hearing, the trial court granted Metropolitan's motion for summary judgment on September 17, 2013. The trial court determined, among other things, that a regular routine was established in which the Parents would contact Patricia for the purpose of informing her of the number of days the following week for which Gen would require care. The Hamptons' use of the word "babysitting" is inconsequential because the $20 per day compensation was adopted as "the price that the Hamptons had previously paid for childcare for their own child." Id. at 12. The trial court also

observed that it was agreed that Patricia would receive "regular compensation" for Gen's care, even though there were a few occasions when she would not be paid. Appellant's App. p. 12. Thus, the trial court determined that the policy exclusions applied and granted Metropolitan's motion for summary judgment.

The Hamptons and the Parents now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

We apply the same standard as the trial court when reviewing a grant or denial of summary judgment. Herron v. Anigbo, 897 N.E.2d 444, 448 (Ind. 2008). Therefore, summary judgment should be affirmed only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Id. All facts established by the designated evidence, and all reasonable inferences from them, are to be construed in favor of the nonmoving party. Id. The fact that the parties have both filed motions for summary judgment does not alter our standard of review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law to the circumstances here. Reed v. Reid, 980 N.E.2d 277, 285 (Ind. 2012).

### II. The Hamptons' Claims

The Hamptons argue that the trial court erred in granting Metropolitan's motion for summary judgment because the homeowner's policy did not exclude coverage under the business activities or the "care of persons" exclusions set forth above and genuine

11

issues of material fact existed with regard to coverage. Appellant's Br. p. 10. The Hamptons further maintain that the trial court did not properly apply the meaning of the exclusionary provisions in the policy to the circumstances here.

In resolving these claims, we note that the interpretation of an insurance policy presents a question of law that is particularly appropriate for summary judgment. Hartford Cas. Ins. v. Evansville Vanderburgh Pub. Library, 860 N.E.2d 636, 640 (Ind. Ct. App. 2007). Insurance policies are governed by the same rules of construction as other contracts. They are construed as a whole after considering all the provisions in the contract and not just the individual words, phrases or paragraphs. Buckeye State Mut. Ins. Co. v. Carfield, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009). If the language in the policy is unambiguous then it should be given its plain and ordinary meaning. Id. The terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms. Niccum v. Niccum, 734 N.E.2d 637, 639 (Ind. Ct. App. 2000). An insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability. Haag v. Castro, 959 N.E.2d 819, 824 (Ind. 2012). A court may not extend coverage beyond that provided by the unambiguous language in the contract. Id.

We also note that an exclusionary clause must clearly and unmistakably express the particular act or omission that will bring the exclusion into play. Jackson v Jones, 804 N.E.2d 155, 158 (Ind. Ct. App. 2004). Finally, insurers are free to limit the coverage

12

of their policies, but such limitations must be clearly expressed to be enforceable. West Bend Mut. v. Keaton, 755 N.E.2d 652, 654 (Ind. Ct. App. 2001).

Turning to the circumstances here, we note, as set forth above, that Metropolitan's policy defines "business" or "business purposes" as "any full or part time activity of any kind engaged in for economic gain, and the use of any part of any premises for such purposes. . . ." Appellant's App. p. 128. The designated evidence establishes that Patricia was engaged in a part-time activity for economic gain. Indeed, the purpose of her business was to care for Gen and protect her from injuries. Caring for Gen on a day-in, day-out basis for compensation amounts to a business activity under the policy. In our view, the only reasonable inference from the Hamptons charging the Parents $20 per day for providing care to Gen was to further their livelihood and generate some extra income once Patricia became a stay-at-home mom. The mere fact that the extra income was "paltry" is of no consequence under the plain language of the policy.

The Parents rely on Mid-American in support of their claim that for the business activity exclusion to apply, there must be a finding that the activity is 1) regularly conducted and 2) "for the purpose of earning a livelihood." Appellant's Br. p. 14. However, the facts in Mid-American concerned the issue of whether property contamination that arose out of petroleum contamination arose out of the insured's "business pursuits." Mid-American, 843 N.E.2d at 551. The insurance policy at issue in Mid-American did not define the phrase "business pursuit" but it did define "business" to include a "trade, profession, or occupation." Id. In relying on other decisions, this Court

13

found that because the insured engaged in various business ventures, including the purchase of the property at issue to aid another business endeavor, his ownership of the property "constituted a . . . regular business activity." Id. at 552.

Unlike the circumstances in Mid-American, the Metropolitan policy did not define "business" as "trade, profession or occupation." Also, the Metropolitan policy does not use the phrase "business pursuit." The Metropolitan policy uses the phrase "business purpose" and, as noted above, that term is fully defined. The Parents' representation that the court in Mid-American interpreted a similar exclusion that controls is simply without merit.

We cannot say that there is legitimate authority to support the theory that Metropolitan's "business purposes" exclusion includes the requirements that the business activity be regularly conducted and for purposes of earning a livelihood. The trial court correctly noted that it was its "duty . . . to analyze the specific language of the insurance policy actually before it to determine the intent of the current parties relating to liability coverage." Appellant's App. p. 13. In doing so, the trial court found that it was not necessarily bound by other decisions that might involve interpretation of similar clauses because an insurance policy must be construed as a whole. Id.

The Parents vehemently argue that the amount of compensation was not sufficient to constitute a "business" as defined in the policy. However, the designated evidence establishes that Patricia found a way to earn money after she left her previous job to become a stay-at-home mom. If some type of profit motive is required, it can arguably

14

be found because, as stated above, the Hamptons charged the Parents what the Hamptons had paid for home childcare for their own child. Thus, we believe that the trial court correctly found that

> The clear intent on the part of Metropolitan, as evidenced by the language contained within both the Care of Persons and Business exclusions, is to negate the extension of liability coverage to endeavors bearing a resemblance to the administration of a business. The Hamptons signaled their assent to this negation of coverage when they signed the insurance policy, thereby creating a binding insurance policy which expressly declines liability coverage for the Hamptons' business activities.

Id. at 13.

In sum, genuine issues of material fact are not in dispute. Patricia engaged in an arrangement to provide care for Gen on a weekly basis in exchange for compensation from the Parents. Caring for Gen over a six-month period, after having negotiated the terms and conditions for the childcare, is a business for which the exclusion under Metropolitan's policy applies. The language of the business exclusion is clear and expressly indicates that no coverage is afforded when considering the undisputed facts of this case. As a result, we conclude that the trial court properly granted Metropolitan's motion for summary judgment.

15

The judgment of the trial court is affirmed.[1]

NAJAM, J., and CRONE, J., concur.

---

[1] As an aside, although we conclude that the trial court properly granted summary judgment under the business exclusion portion of Metropolitan's policy, the grant of summary judgment in Metropolitan's favor is equally proper under the "care of persons" clause of the policy. More specifically, the designated evidence established that Gen sustained her injuries as a result of rolling off of a bed while Patricia was providing care to her inside her residence. Appellant's App. p. 122. Additionally, we agree with the trial court's observation that the Parents' characterization of the services that Patricia provided was "babysitting" rather than "child care," is not persuasive. Finally, we note that Patricia's care for Gen was "regular" within the meaning of the policy. The designated evidence established that it was the parties' understanding that Patricia's care of Gen was regular, each week and each day. Gen was dropped off at approximately 7:00 a.m. and picked up around 5:00 p.m. for the entire six-month period. In light of this designated evidence, Metropolitan was also entitled to summary judgment on this basis.