# FOR PUBLICATION



FILED
Nov 05 2014, 9:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**JAMES P. STRENSKI**
**DENNIS F. CANTRELL**
Cantrell Strenski & Mehringer, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**KEVIN W. MARSHALL**
Hobart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ERIE INSURANCE EXCHANGE, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  44A03-1403-CT-97 |
| | ) | |
| TROY SAMS and TERESA SAMS, | ) | |
| | ) | |
| Appellees-Defendants, | ) | |
| Counterclaimants. | ) | |

APPEAL FROM THE LAGRANGE CIRCUIT COURT
The Honorable J. Scott Vanderbeck, Judge
Cause No. 44C01-1212-CT-19

**November 5, 2014**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Following a bench trial, Erie Insurance Exchange ("Erie") appeals the trial court's judgment ordering Erie to pay $63,924.89 to Troy Sams and Teresa Sams (the "Samses") for losses they sustained after a storm damaged their home. We affirm.

## Issues

Erie presents two issues for review, which we reframe as:

I.   Whether the trial court erred in finding that the Samses' loss was covered under the Erie policy, despite the presence of policy exclusions for loss caused by deterioration and faulty construction materials; and

II.  If the Samses' loss was covered by the Erie policy, whether the trial court's judgment of $63,924.89 in replacement cost was clearly erroneous.

## Facts and Procedural History

In 1998, the Samses built a home in Howe, Indiana. On April 12, 2012, a storm that produced eighty-mile-per-hour winds blew through the Howe area. The wind damaged the exterior vinyl siding and tore shingles off the multi-peaked roof of the Samses' home. Prior to the storm, the Samses did not have any water leaks in the house. After the storm, the southwest slope of the roof, located above the kitchen, began to leak. Water also infiltrated the living room, located in the center of the home under a north-south roof ridge, and damaged the interior car siding that lined the room's cathedral ceiling. After the water damage, mold began to grow in the cathedral ceiling beams.

In June 2012, the Samses filed a claim with Erie, their homeowners insurance carrier, for all storm damage. At the time, the Samses were covered under Erie's Ultracover

2

HomeProtector Policy (the "Policy"), which, in addition to personal property and other structures, provided replacement cost coverage for the residence dwelling up to $254,000. Under *Dwelling Coverage*, the Policy stated, in relevant part:

> We will pay for loss to:
>
> 1. Your dwelling at the residence premises shown on the Declarations. Dwelling includes attached structures, and building equipment and fixtures servicing the premises.

(App. at 30.)[1] Under *Perils We Insure Against*, the Policy further stated:

> We pay for direct physical loss to property insured under the *Dwelling . . . Coverage*[], except as excluded or limited herein.

(App. at 31.)

> These two provisions were subject to various exclusions, including:
>
> We do not pay for loss resulting directly or indirectly from any of the following, even if other events or happenings contributed concurrently, or in sequence, to the loss:
>     . . . .
>     5.  caused by:
>         . . . .
>         b.  mechanical breakdown, deterioration, wear and tear, marring, inherent vice, latent defect, tree roots, rust or smog.

(the "Deterioration Exclusion") (App. at 31-32, 45.)[2]

> We do not pay for loss:
>
> 1. by weather conditions if any peril excluded by this policy contributes to the loss in any way.

---

[1] Throughout the Policy, defined terms such as "we," "your," and "residence premises" appear in boldface type. For ease of reading, we have eliminated the boldface in all Policy language quoted in this opinion.

[2] Language reflects the Policy as modified by endorsements in effect at the time of the Samses' loss. (App. at 45.)

3

2. caused by, resulting from, contributed to or aggravated by faulty or inadequate

. . . .

    b. design, development of specifications, workmanship, construction;

    c. materials used in constructions; or

    d. maintenance;

of property whether on or off the residence premises by any person, group, organization, or governmental body.

(the "Faulty Materials Exclusion") (App. at 33.)

The Policy also contained a $5,000 limit on "[d]irect physical loss . . . caused by, resulting from, or consisting of fungi, wet or dry rot, or bacteria if the direct result of a *Peril We Insure Against*[.]" (App. at 45.) Under the Policy, "fungi" includes mold. (App. at 45.)

As to Erie's loss settlement procedures, the Policy provided:

Loss under *Dwelling Coverage* will be settled on a replacement cost basis, without deduction for depreciation, if the damage is actually repaired or replaced. Payment will not exceed the smallest of the following amounts:

1. the replacement cost of that part of the dwelling damaged for equivalent construction and use on the same premises; or
2. the amount actually and necessarily spent to repair or replace the damaged dwelling.

We will pay no more than the actual cash value of the damage until the actual repair or replacement is completed. [. . . .]

You may disregard the replacement cost provision and make claim for loss or damage to the dwelling on an actual cash value basis. However, you still have the right to make claim within 180 days after the loss, for any additional amounts we will be required to pay under this *Loss Settlement* provision.

4

(the "Loss Settlement Provision") (App. at 36, 50.)[3]

On June 27, 2012, an Erie insurance adjuster inspected the property and found wind damage to one section of vinyl siding, missing roof shingles on the southwest slope with corresponding water infiltration in the kitchen, and evidence of water damage on the interior car siding on the living room's cathedral ceiling. The adjuster also noted that the shingles across the roof, primarily on the south exposure, were deteriorated. The adjuster authorized payments for: 1) repair of the siding; 2) replacement of the shingles on the southwest slope of the roof only; 3) repairs to the water damage on the ceiling, including the car siding; 4) replacement of some insulation in those areas; and 5) the $5,000 policy maximum for mold remediation and associated repairs. Erie found the total replacement cost was $13,822.90 and paid the actual cash value of $10,937.15, pending completion of the repairs. Erie also paid approximately $1,800 for tarp to cover the roof, bringing Erie's total payout to $12,752.15.

Unsatisfied with Erie's evaluation, the Samses obtained their own estimate, which included costs for replacement of all exterior vinyl siding, complete replacement of the roof, full replacement of the car siding on the cathedral ceiling, and repairs to the insulation. The total estimated cost was approximately $108,000, revised to $124,540.74 just prior to trial. (Tr. at 66.)

In response, Erie hired forensic engineer Timothy Lee ("Lee") to inspect the Samses' home. Lee believed that the water damage in the cathedral ceiling was not caused by a leaky

---

[3] Language reflects the Policy as modified by endorsements in effect at the time of the Samses' loss. (App. at 50.)

roof, but from condensation that formed due to improper attic ventilation. Lee further concluded that the south side of the roof had deteriorated due to heat damage sustained well before the storm. Based on Lee's report, Erie determined that the Deterioration and Faulty Materials Exclusions applied and therefore the Policy did not cover any damage except the siding repair and replacement of the shingles blown off the southwest slope. Erie sent the Samses a letter with an updated estimate stating that Erie's obligation was only $3,436.69, denying further coverage, and informing the Samses that they could retain the balance of the payment Erie already made.

On December 19, 2012, Erie filed a complaint seeking a declaratory judgment that Erie had no further obligation to the Samses on the claim. The Samses filed a counterclaim for breach of contract. On January 31, 2014, a bench trial was held. On March 4, 2014, the court issued findings of fact and conclusions thereon and entered judgment in favor of the Samses in the amount of $63,924.89.

Erie now appeals.

**Discussion and Decision**

Standard of Review

*Indiana Trial Rule 52.* When matters are tried before the court without a jury, Indiana Trial Rule 52 provides that a court, either *sua sponte* or upon a party's written request filed prior to the admission of evidence, "shall find the facts specially and state its conclusions thereon." T.R. 52(A). Where, as here, the court enters findings and conclusions without a written request, the entry of findings and conclusions is considered *sua sponte*. Samples v.

6

Wilson, 12 N.E.3d 946, 949 (Ind. Ct. App. 2014). When a trial court enters specific findings *sua sponte*, the specific findings control our review and the judgment only as to the issues those specific findings cover. Id. at 949-50. Where there are no specific findings, a general judgment standard applies, and we may affirm on any legal theory supported by the evidence. Id. at 950.

Our standard of review for findings and conclusions is two-tiered: we first determine whether the evidence supports the court's findings, and we then determine whether the findings support the judgment. Buckeye State Mut. Ins. Co. v. Carfield, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009), trans. denied. Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record lacks any evidence or reasonable inference from the evidence to support them. Id. A judgment is clearly erroneous if it is unsupported by the findings and conclusions. Id. In conducting our review, we consider only the evidence and reasonable inferences that support the judgment and do not reweigh evidence or reassess the credibility of witnesses. Id.

*Construction of Insurance Policy Terms.* Although we defer substantially to the trial court's findings of fact, we review questions of law *de novo*. Id. The interpretation of an insurance policy, as with other contracts, is a question of law. Id.

> When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases[,] or paragraphs. If the language is clear and unambiguous, we give the language its plain and ordinary meaning. An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning.

7

However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language.

Id. (internal citations omitted). When an ambiguity arises,

[a]mbiguous provisions in insurance policies are construed in favor of the insured. This is particularly true with unclear provisions that limit or exclude coverage. Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the customer. The insurance companies write the policies; we buy their forms or we do not buy insurance.

Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co., 698 N.E.2d 770, 773 (Ind. 1998) (internal quotation marks and citations omitted). When interpreting insurance contracts, we seek to harmonize the provisions, rather than leave them in conflict. Argonaut Ins. Co. v. Jones, 953 N.E.2d 608, 615 (Ind. Ct. App. 2011), trans. denied.

## Storm Coverage and Exclusions

In this case, the trial court found that on April 12, 2012, the Samses' "house was damaged by a severe windstorm, with winds in excess of 80 miles per hour . . . ." (App. at 8.) The court found that "[b]efore April 12, 2012 the roof did not leak, and the inside of the house had no observable condensation or water on the car siding or anywhere else." (App. at 8.) However, "[a]fter the windstorm, Troy Sams found many roof parts on the ground from entire shingles to parts of shingles." (App. at 8.) Overall, "[i]t was a sound roof before the loss, without leaks, and an unsound roof after the loss, with leaks many places on the roof." (App. at 10.) Moreover, because "the evidence shows that the windstorm blew shingles and parts of shingles off of the house, causing roof leaks, [a] hole in the siding[,] and water and

8

mold inside the house," (App. at 12.), the court found that "[t]he cause of the loss to the Sams[es]' roof, siding[,] and car siding [was] the April 12, 2012 windstorm." (App. at 11.) Because the losses stemmed from storm damage, the court concluded that the Samses were covered under the Policy.[4]

These findings and conclusions are supported by the record, in which Troy Sams ("Troy") testified that the Samses' roof never leaked and there was no interior water damage before the storm; however, after the storm, the roof started leaking and water infiltrated the home. Troy also testified that when he returned home after the storm, he found "[p]ieces, tabs, and parts of shingles" from all parts of the roof on the ground. (Tr. at 219.) Although the shingles were thirty-five year shingles, they were only on the roof for fourteen years. In addition, the Samses' contractor, Eric Pearson ("Pearson"), who had regularly been to the Samses' home before the storm, never observed damage to the roof before the storm, but observed wind damage in several parts of the roof after the storm. As to the siding, Erie's adjustor observed wind damage to a section of vinyl siding. Over the fourteen years the Samses owned the home, they never before made a claim for damage to the dwelling. The court's finding that the storm caused the damage to the roof, exterior siding, and interior ceiling thus finds support in the record.

---

[4] Erie points out that "the trial court's March 4, 2014 Findings of Fact and Conclusions of Law cited to no specific language in the Erie Policy whatsoever." (Appellant's Br. at 11.) This does not preclude our review. Because the court's findings and conclusions were entered *sua sponte*, where there are no specific findings, we may affirm on any legal theory supported by the evidence. Samples, 12 N.E.3d at 950.

The Policy unambiguously covers losses to insured property caused by storm damage.[5]

Nevertheless, Erie argues that the Deterioration and Faulty Materials Exclusions apply and thus preclude the Samses from recovering. The Deterioration Exclusion, as modified by applicable endorsements, reads:

> We do not pay for loss resulting directly or indirectly from any of the following, even if other events or happenings contributed concurrently, or in sequence, to the loss:
>
> . . . .
>
> 5. caused by:
>
> . . . .
>
> b. mechanical breakdown, deterioration, wear and tear, marring, inherent vice, latent defect, tree roots, rust or smog.

(App. at 31-32, 45.) The Faulty Materials Exclusion provides:

> We do not pay for loss:
>
> 1. by weather conditions if any peril excluded by this policy contributes to the loss in any way.
> 2. caused by, resulting from, contributed to or aggravated by faulty or inadequate
>
> . . . .
>
> b. design, development of specifications, workmanship, construction;
> c. materials used in constructions; or
> d. maintenance;
>
> of property whether on or off the residence premises by any person, group, organization, or governmental body.

(App. at 33.) Erie argues that either or both of these exclusions apply because "the undisputed evidence introduced at trial was that the shingles at the [r]esidence were faulty

---

[5] Neither party, at trial or on appeal, disputes that, absent other causes or exclusions, the Policy covers storm damage.

10

and had been deteriorating well before the April, 2012 storm . . . ." (Appellant's Br. at 9.) Because the court heard evidence of shingle deterioration, Erie contends that the deterioration, not the storm, was the proximate cause of the Samses' loss.

The plain and ordinary meaning of the Policy language is that, in order for the Deterioration Exclusion to apply, the loss must be "*caused by* . . . deterioration." (App. at 32, 45 (emphasis added).) For the Faulty Materials Exclusion to apply, a "peril excluded by this policy" must "*contribute[] to* the loss," or the loss must be "*caused by, resulting from, contributed to* or *aggravated by* faulty or inadequate" workmanship, construction, or materials. (App. at 33 (emphasis added).) Therefore, for the exclusions to apply, Erie must have shown not only that the shingles were deteriorated or faulty, but that the deterioration or faulty materials caused, contributed to, or aggravated the damage.

In sum, Erie urges us to supplant the trial court's findings as to the cause and instead find that "it was the deteriorated and faulty shingles that set in motion the series of events that led to the loss[.]" (Appellant's Br. at 16.) We decline Erie's request to reweigh the evidence. See Associated Aviation Underwriters v. George Koch Sons, Inc., 712 N.E.2d 1071, 1073 (Ind. Ct. App. 1999), trans. denied. There is support in the record for the trial court's finding that the storm caused the damage. The court found no other causes. Because the Policy unambiguously covers storm damage, the trial court's conclusion is not clearly erroneous.

Replacement Cost Coverage

11

Having established that the Samses' loss is covered, we turn to Erie's contention that the trial court's judgment of $63,924.89 in replacement cost is erroneous. The Policy's Loss Settlement Provision provides:

> Loss under *Dwelling Coverage* will be settled on a replacement cost basis, without deduction for depreciation, if the damage is actually repaired or replaced. Payment will not exceed the smallest of the following amounts:
>
> 1. the replacement cost of that part of the dwelling damaged for equivalent construction and use on the same premises; or
> 2. the amount actually and necessarily spent to repair or replace the damaged dwelling.
>
> We will pay no more than the actual cash value of the damage until the actual repair or replacement is completed. [. . . .]
>
> You may disregard the replacement cost provision and make claim for loss or damage to the dwelling on an actual cash value basis. However, you still have the right to make claim within 180 days after the loss, for any additional amounts we will be required to pay under this *Loss Settlement* provision.

(App. at 50.) The Samses sought replacement cost, rather than actual cash value.

Unlike actual cash value insurance, in which the insured is made whole but not put in a better position, replacement cost coverage "reimburses the insured for the full cost of repairs, if he repairs or rebuilds the building, even if that results in putting the insured in a better position than he was before the loss." Travelers Indem. Co. v. Armstrong, 442 N.E.2d 349, 352 (Ind. 1982) (emphasis removed). As an optional coverage that may be purchased, it is more expensive because the rate of premiums is higher and the amount of insurance to which that rate applies is usually higher. Id. at 353. As our supreme court has explained (in

the context of a loss caused by fire), replacement cost coverage meets the insured's needs as follows:

> Since fire is an unwanted and unplanned for occurrence, why can't the owner of an older home buy insurance to cover the full cost of repair even if those repairs make it a better or more valuable building? Since at the time of fire the homeowner may be least able to pay for improvements, why can't that hazard be insured too? Instead of apportioning the cost of repair after a fire between the actual cash value, to be paid by the insurer, and the betterment to be paid by the insured, why can't the policyholder simply pay a higher premium each year but not have to pay anything more to have his home fully repaired in the event of fire?

Id. Thus, "[w]hen the insurance industry adopted a standard extension of coverage endorsement to provide replacement cost, it took into account the one great hazard in providing this kind of coverage: the possibility for the insured to reap a substantial profit, if [a loss] occurs." Id.

As discussed above, there is support in the record for the court's finding that the roof, cathedral ceiling, and exterior vinyl siding of the Samses' home sustained direct physical damage during the windstorm. The court also found that the "house was in uniform appearance before the loss, including the roof and [exterior] siding." (App. at 10.) Furthermore, both Pearson and insurance adjustor Joseph Hoffman ("Hoffman") testified that mismatched roof slopes and exterior siding devalue a home. This testimony provides support for the court's finding that replacing one slope of the roof or one section of siding would devalue the home because the roof and siding would not match. On these findings, the court concluded that the Policy's "[r]eplacement cost coverage applies to the entire roof, the entire

13

outside siding, and the entire cathedral ceiling as separate parts of the building, less than [an] adjustment required by the policy endorsement for mold damage." (App. at 11.)

To arrive at its judgment of $63,924.89, the court evaluated the damage estimates presented by both parties.[6] On the lowest end, Erie presented an estimate prepared by Servpro of West St. Joseph County & South Bend Northeast ("Servpro") for $27,612.86, which included the estimated costs to replace the whole roof, repair the interior water damage, and reset a portion of the vinyl siding. The court added to that Servpro's $4,360.98 estimate for drying out the home, for a total of $31,973.84. On the high end, the court used Hoffman's estimate of $139,236.23, which was an adjustment of a Servpro estimate and included the panoply of repairs the Samses requested. The court adjusted down the Samses' high estimate to reflect the Policy's $5,000 limit for mold remediation. The court then reduced both estimates by the $12,752.15 Erie had already paid. Because of the "wide disparity" between the parties' adjusted estimates, the court averaged them to arrive at a judgment of $63,924.89. (App. at 13.)

Erie argues the trial court erred because it based its judgment on estimates that included repairs for which Erie was not obligated to pay. Erie contends that the Policy's replacement cost coverage does not require Erie to reimburse the Samses for full replacement

---

[6] In this case, although the roof had been replaced at the time of trial, some repairs were not yet made. We acknowledge that the Policy provides for replacement cost "if the damage is actually repaired or replaced." (App. at 50.) This language is common in replacement cost provisions. See Armstrong, 442 N.E.2d at 352. However, Erie does not appeal the court's judgment on the theory that the Samses did not satisfy a condition precedent. Accordingly, we do not address whether the Samses' failure to make the necessary replacements is excused under these circumstances. See, e.g., Rockford Mut. Ins. Co. v. Pirtle, 911 N.E.2d 60, 66-67 (Ind. Ct. App. 2009) (excusing the insured's failure to repair or replace under a replacement cost endorsement), trans. denied.

of the roof, cathedral ceiling's car siding, and exterior vinyl siding. Erie directs our attention to the Loss Settlement Provision, which states that "[p]ayment will not exceed . . . the replacement cost of that part of the dwelling damaged for equivalent construction and use on the same premises[.]" (App. at 50.) Erie argues that "part of the dwelling damaged" means only the individual roof slopes or sections of vinyl siding that sustained direct physical damage during the storm, not the roof and the siding as a whole. Essentially, Erie argues that it drafted an ambiguous provision and that we should exercise *de novo* review to interpret any ambiguity in the phrase "part of the dwelling damaged" in Erie's favor.[7]

It is unnecessary to conduct a *de novo* review in this case. Ambiguity "is not established simply because controversy exists." Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d 243, 248 (Ind. 2005). The Policy unambiguously provides for replacement cost when damage occurs to the property insured. Based on the evidence presented, the trial court found as a factual matter that the roof, cathedral ceiling, and exterior vinyl siding of the Samses' home (the property insured) sustained direct physical damage during the windstorm. As such, the Policy unambiguously covers the replacement cost for damages to the roof, cathedral ceiling, and vinyl siding.

---

[7] Although we do not decide the case on this theory, we fail to see much benefit to Erie. Were we to adopt Erie's approach and find the phrase ambiguous, Indiana law is clear that ambiguities in insurance contracts are resolved in favor of the insured. See Meridian Mut. Ins. Co., 698 N.E.2d at 773. Also, the trial court specifically found that the *entire* roof was damaged in the storm. Even under Erie's restrictive interpretation, then, the roof is the "part of the dwelling damaged" and all roofing costs – and any cost stemming from the resulting water damage – would be covered. These costs represent the majority of the estimated replacement cost.

As to the measure of replacement cost owed for these damages, both parties had an opportunity to fully and fairly litigate the issue. The court heard evidence regarding the extent of the damage and the cost of replacement. The parties procured estimates for the losses incurred, which varied widely on factors including the scope of the work and the cost of the materials and labor. Erie introduced into evidence no less than seven estimates prepared at its request. To the extent that some estimates included costs Erie believed were unnecessary, it appears that the trial court was not persuaded by Erie's argument that the "uniform appearance" of the Samses' home before the storm could be achieved at Erie's quoted prices. (App. at 10.)

The trial court based its judgment on the evidence the parties introduced, and the court's judgment is well within the evidence presented. Therefore, under these specific facts, and based on the evidence presented in this case, the court's judgment that the replacement cost of the Samses' damaged roof, cathedral ceiling, and exterior vinyl siding was $63,924.89 was not clearly erroneous.

## Conclusion

The trial court did not err in finding that the Erie Policy covered the storm damage to the Samses' home. In addition, the court's judgment of $63,924.89 was not clearly erroneous.

Affirmed.

NAJAM, J., and PYLE, J., concur.