IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE AEARO TECHNOLOGIES LLC INSURANCE APPEALS | § § § § § § § § § § § | Nos. 381, 2024 423, 2024 <br><br> Court Below—Superior Court of the State of Delaware <br><br> C.A. No. N23C-06-255 |

Submitted: May 14, 2025
Decided: August 12, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

David J. Baldwin, Esq., Peter C. McGivney, Esq., Berger McDermott LLP, Wilmington, Delaware; Robin L. Cohen, Esq. (*argued*), Kenneth H. Frenchman, Esq., Orrie A. Levy, Esq., Cohen Ziffer Frenchman & McKenna LLP, New York, New York; Donald W. Brown, Esq., Covington & Burling LLP, San Francisco, California; Rani Gupta, Esq., Covington & Burling LLP, Palo Alto, California; Tyler Weinblatt, Esq., Covington & Burling LLP, Washington, DC, *for Appellants Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Company.*

David J. Soldo, Esq., Morris James LLP, Wilmington, Delaware; Joshua D. Weinberg, Esq. (*argued*), Sean T. Kelly, Esq., Ruggeri Parks Weinberg LLP, Washington, DC, *for Appellee Twin City Fire Insurance Company.*

Peter B. Ladig, Esq., Elizabeth A. Powers, Esq., Justin C. Barrett, Esq., Bayard, P.A., Wilmington, Delaware; Suzanne C. Midlige, Esq. (*argued*), Michael E. Hrinewski, Esq., Coughlin Midlige & Garland LLP, Morristown, New Jersey, *for Appellee MS Transverse Specialty Insurance Company, f/k/a Transverse Specialty Insurance Company, f/k/a Royal Surplus Lines Insurance Company.*

Richard L. Renck, Esq., Tracey E. Timlin, Esq., Duane Morris LLP, Wilmington, Delaware; Garrett B. Moritz, Esq., R. Garrett Rice, Esq., Ross Aronstam & Moritz LLP, Wilmington, Delaware; Robert M. Palumbos, Esq., Andrew R. Sperl, Esq. (*argued*), Ryan F. Monahan, Esq., Duane Morris LLP, Philadelphia, Pennsylvania; Daren S. McNally, Esq., Barbara M. Almeida, Esq., Daniel B. Palmer, Esq., Clyde & Co US LLP, Morristown, New Jersey, *for Appellee ACE American Insurance Company.*

Joseph B. Cicero, Esq., Chipman Brown Cicero and Cole LLP, Wilmington, Delaware, *for Appellees American National Fire Insurance Company, Great American Insurance Company, and TIG Insurance Company.*

Aaron M. Nelson, Esq., Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, *for Appellees Illinois National Insurance Company, American International Specialty Lines Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA.*

**GRIFFITHS, Justice, for the Majority:**

In this insurance coverage action, a corporate parent sought coverage from its subsidiaries' insurers for defense costs that the parent and its subsidiaries incurred in the defense of products-liability lawsuits. This appeal centers on the self-insured retention provisions of the insurance policies. In many insurance contracts, a self-insured retention functions as a condition precedent to coverage and must be satisfied before an insurer's coverage obligations are triggered. We must decide whether, based on the language of the insurance policies, the insureds' corporate parent can satisfy each policy's self-insured retention given that each policy required the "Named Insured" to satisfy the retention and the corporate parent is not a "Named Insured" under any policy. The Superior Court determined that, because each policy required the "Named Insured" to satisfy the retention and the corporate parent was not a "Named Insured," payments made by the parent did not satisfy the retentions, so the insurers' coverage obligations had not been triggered. We agree.

The insureds and the parent made an alternative argument that, even if the insureds had to satisfy the retentions and did not do so, each policy's "maintenance clause" still entitled them to coverage for all defense costs, minus the amount the insureds owed for the retention. The Superior Court found that the maintenance clauses had not been triggered. We find that the maintenance clauses do not apply in this case. We affirm.

3

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Earplug Lawsuits and Aearo's Bankruptcy Proceedings

In the late 1990s, plaintiffs below, appellants Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, and Aearo LLC (collectively, "Aearo") developed and distributed a type of earplug known as the Combat Arms Earplugs for military and non-military users.[1] In 2008, plaintiff below, appellant 3M Company ("3M") acquired Aearo and continued to produce the Combat Arms Earplugs for the next several years.[2]

Beginning in 2018, 3M and Aearo were named in lawsuits alleging defects in, and personal injury caused by, the Combat Arms Earplugs.[3] The plaintiffs claimed that they experienced hearing-related injuries due to defective design of the Combat Arms Earplugs.[4] Most of the lawsuits were consolidated into a multidistrict litigation in the United States District Court for the Northern District of Florida (the

---

[1] App. to Opening Br. at A443–44 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment) [hereinafter A___]; Ex. A to Opening Br. at 1–2; *see also Aearo Techs. LLC v. ACE Am. Ins. Co.*, 2024 WL 3495121, at *1 (Del. Super. July 16, 2024). The facts are taken from the summary judgment record.

[2] A438–39, A444 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment); A127–28 (Am. Compl. ¶ 2).

[3] A439–40 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment).

[4] *Id.*

"MDL").[5]  The MDL comprised over 280,000 lawsuits at its peak.[6]  A smaller number of lawsuits were coordinated and litigated in Minnesota state court (together with the MDL, the "Earplug Lawsuits").[7]  Twenty-seven of the Earplug Lawsuits were selected as bellwether cases—eight were dismissed before trial, six resulted in defense verdicts for 3M and Aearo, and thirteen resulted in verdicts for plaintiffs.[8]

Additionally, in July 2022, while the Earplug Lawsuits were ongoing, Aearo filed voluntary petitions for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Indiana.[9]  The bankruptcy court, relying on a 3M Form 10-K, noted that 3M adopted a strategy to have Aearo file for bankruptcy to manage the liabilities arising from the Earplug Lawsuits, not because Aearo was in financial distress.[10]  In June 2023, the bankruptcy court dismissed Aearo's

---

[5] A439 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment); *see also In re: 3M Combat Arms Earplug Products Liability Litigation*, No. 3:19-md-2885.

[6] A439 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment).

[7] A441 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment).  Approximately 2,000 claims have been litigated in Minnesota state court for the functionally identical civilian version of the Combat Arms Earplugs.  *Id.*

[8] A144 (Am. Compl. ¶ 59); A3825 (Aff. of Eric Rucker in Support of Aearo's and 3M's Opposition to Twin City's Motion for Partial Summary Judgment).

[9] *In re Aearo Techs. LLC*, 2023 WL 3938436, at *1 (Bankr. S.D. Ind. June 9, 2023).  Specifically, each Aearo entity, including all relevant to this case, filed a bankruptcy petition under Chapter 11 of the United States Bankruptcy Code.  *Id.*

[10] *Id.* at *5 ("[I]n 3M's most recent annual Form 10-K, filed earlier [in 2023] . . ., 3M stated: 'Following conclusion of the bellwether trial process and unsuccessful settlement discussions, and with another 2,000 cases being prepared for trial while the company's appeals are still pending,

bankruptcy petitions, concluding that Aearo is "financially healthy" and "is not presently suffering financial problems of the type that warrants Chapter 11 relief."[11]

Two months later, 3M and Aearo reached a global settlement of $6.01 billion for the Earplug Lawsuits.[12]  3M states that it has paid over $370 million in legal fees and defense costs for the Earplug Lawsuits.[13]  For its part, Aearo Technologies LLC states that it has paid approximately $411,000 in legal fees and defense costs for the Earplug Lawsuits.[14]

B.      This Insurance Coverage Litigation

A few weeks after the bankruptcy court dismissed Aearo's petitions, Aearo and 3M filed this insurance coverage action against Aearo's insurers seeking coverage for, among other things, the defense costs incurred by both Aearo and 3M in the Earplug Lawsuits.

---

the Aearo entities and the company adopted a change in strategy for managing these litigation liabilities that led to the Aearo entities initiating the Chapter 11 proceedings.'").

[11] *Id.* at *17, *20.

[12] A447 (Aff. of Eric Rucker in Support of Aearo's and 3M's Partial Motion for Summary Judgment).

[13] A856 (Aff. Cheryl Muellner in Support of Aearo's and 3M's Partial Motion for Summary Judgment) ("Exhibit 1 is a true and correct copy of a spreadsheet that [Muellner] generated from 3M's Onit system that accurately reflects legal fees and defense costs of $371,847,607.66, paid by 3M for work undertaken by law firms and other vendors in defense of the [Earplug Lawsuits], solely for the period of January 1, 2019, through July 31, 2022.").

[14] A922–23 (Aff. of Michael Bertha in Support of Aearo's and 3M's Partial Motion for Summary Judgment) ("Exhibit 1 is a true and correct copy of a spreadsheet that was generated from Aearo Technologies LLC's SAP system that accurately reflects legal fees and defense costs of $411,696.70, paid by Aearo Technologies LLC for work undertaken by law firms and other vendors in defense of the [Earplug Lawsuits] as of July 30, 2022.").

### 1. The Insurance Policies

Three policies are relevant to this appeal. Defendants below, appellees Twin City Fire Insurance Company ("Twin City"), ACE American Insurance Company ("ACE"), and MS Transverse Specialty Insurance Company, f/k/a Transverse Specialty Insurance Company, f/k/a Royal Surplus Lines Insurance Company ("Royal Surplus") each issued a commercial general liability insurance policy to an Aearo entity in the years preceding 3M's acquisition of Aearo.[15] Because this appeal concerns interpretation of the three policies, it is necessary to set out the relevant provisions.

### a. The Twin City Policy

Central to this appeal is the definition of "self-insured retention" ("SIR") and the meaning of the word "you" in each policy. Twin City issued an "excess commercial general liability insurance policy" to Aearo Corporation—now, Aearo LLC[16]—for the period of September 30, 2000 to November 2001.[17] The policy provides:

---

[15] The Superior Court also considered policies issued by other insurers: General Star Indemnity Company, Liberty Insurance Underwriters Inc., and Liberty Surplus Insurance Corporation. These insurers, through stipulation with Aearo and 3M, were dismissed from this appeal with prejudice. *See* No. 381, 2024 (Dkts. 49, 52). We do not consider the policies issued by those insurers in this appeal.

[16] For clarity, we refer to Aearo Corporation as Aearo LLC throughout this decision.

[17] *See* A1035 (Twin City Policy) (stating the policy period); A1003 (Twin City Policy) (naming Aearo Corporation as the "Named Insured"); A269 (Aff. of Rani Gupta in Support of Aearo's and 3M's Partial Motion for Summary Judgment) (noting the name change from Aearo Corporation to Aearo LLC); A273–74 (Aearo Corporation's Certificate of Conversion). There is a discrepancy

> [Twin City] will pay on behalf of the insured those sums that the insured shall become legally obligated to pay as damages because of "bodily injury," . . . but only to the extent that such damages are in excess of the [SIR] that has been exhausted solely by the payment of "claim expenses[.]" . . . The insured will also have the obligation of paying . . . all defense costs. These costs will continue to be borne by the insured until the [SIR] has been exhausted solely by the payment of "claim expenses[.]"[18]

The policy further states that Twin City "will pay 'claim expenses' which are incurred after the exhaustion of the [SIR], but only if the insured has satisfied its [SIR] obligation."[19]

Under the Twin City policy, SIR is defined as

> the amount you or any insured must pay as damages and "claim expenses" . . ., before [Twin City] pays anything. Your obligation to pay the [SIR] . . . shall not be reduced by . . . [a]ny payment made on your behalf by another, including any payment from any other applicable insurance.[20]

---

regarding when the Twin City policy period ended. Twin City filed an affidavit with its summary judgment briefing, which states that the policy period ended November 12, 2001. A1516–17 (Aff. of Joseph Juidiciani in Support of Twin City's Partial Motion for Summary Judgment). But Aearo and 3M direct us to the Twin City policy, which states that the policy period ended November 29, 2001. A1035 (Twin City Policy). This discrepancy is not material for purposes of this appeal.

[18] A1004 (Twin City Policy).

[19] A1010 (Twin City Policy).

[20] A1020 (Twin City Policy). The policy defines "claim expenses" as "[a]ll expenses incurred by or on behalf of the insured with [Twin City's] written consent[.] . . . But 'claim expenses' include only those expenses incurred in the investigation of 'claims' or defense of 'suits[.]'" A1017 (Twin City Policy).

The policy states that "you" and "your" "refer to the Named Insured in the Declarations[.]"[21] The "Named Insured" is Aearo LLC.[22] The SIR is $250,000 per occurrence, subject to an aggregate maximum of $1.5 million.[23]

The Twin City policy contains a maintenance clause, titled "Maintenance of the [SIR]," which states that Aearo LLC

> shall do whatever is required, including provision of sufficient funds, to maintain the [SIR] in full effect during the currency of this policy. If the [SIR] becomes invalid, suspended, unenforceable or uncollectable for any reason, including bankruptcy or insolvency, we shall be liable only to the extent we would have been had such [SIR] remained in full effect.[24]

### b. The Royal Surplus Policy

Next, Royal Surplus issued a "commercial general liability" policy to Aearo LLC for the period of September 30, 1997 to September 30, 2000.[25] The policy states that Royal Surplus

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance

---

[21] A1004 (Twin City Policy).

[22] A1035, A1003 (Twin City Policy).

[23] A1023 (Twin City Policy).

[24] A1015 (Twin City Policy).

[25] A4973 (Royal Surplus Policy) (stating the policy period); A4984 (naming Aearo Corporation as the "Named Insured"). In the briefs, there is a discrepancy regarding when the Royal Surplus policy started. Royal Surplus filed a transmittal affidavit in the Superior Court stating that the policy period started on September 30, 1998. A4970–71 (Transmittal Aff. of Justin C. Barrett in Support of Royal Surplus's Joinder to Motions for Summary Judgment). Aearo and 3M, however, direct the Court to the Royal Surplus policy, which states that the policy period started on September 30, 1997. *See* A945, A4973 (Royal Surplus Policy). As with the Twin City policy, this discrepancy is not material for purposes of this appeal.

applies. [Royal Surplus] will have the right and duty to defend the insured against any "suit" seeking those damages. However, [Royal Surplus] will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" . . . to which this insurance does not apply.[26]

The policy further states that "[e]xpenses incurred in the investigation, settlement or defense of a claim . . . are . . . included in the 'Retained Limit' [i.e., SIR]."[27]

The SIR is defined as "the amount . . . which you are obligated to pay and only includes damages otherwise payable under this policy."[28] The SIR endorsement next states that Royal Surplus's "obligation . . . to pay damages on your behalf applies only to that amount of damages in excess of the [SIR]."[29] The policy provides that "you" and "your" "refer to the Named Insured shown in the Declarations[.]"[30] The "Named Insured" is Aearo LLC, as well as certain

---

[26] A5020 (Royal Surplus Policy).

[27] A5015 (Royal Surplus Policy). For clarity, we refer to the Retained Limit in the Royal Surplus policy as an SIR. There is no meaningful distinction between the two for purposes of this decision.

[28] A5015 (Royal Surplus Policy).

[29] *Id.*

[30] A5020 (Royal Surplus Policy).

subsidiaries.[31]  The SIR is $250,000 per occurrence, subject to an aggregate maximum of $1.5 million.[32]

The Royal Surplus policy contains a maintenance clause, titled "Non Drop Down Bankruptcy or Insolvency of the Named Insured," which states:

> For all purposes of this policy, if the [SIR] is not available or collectible because of (a) the bankruptcy or insolvency of the named insured or (b) the inability or failure for any other reason of the named insured to comply with the provisions of the [SIR] endorsement, then this policy should apply (and amounts payable hereunder shall be determined) as if such [SIR] were available and collectible.[33]

### c. The ACE Policy

Finally, ACE issued a "commercial general liability policy" to Aearo Holding Corporation and Aearo Company—now, Aearo Holding LLC and Aearo Technologies LLC, respectively[34]—for the period of September 30, 2007 to

---

[31] A4984 (Royal Surplus Policy).  This policy states that "Named Insured" also includes "[a]ll subsidiary and affiliated entities or successors, as may now or hereafter exist by way of acquisition, merger, formation or transformation in which [Aearo LLC] has at least a 51% ownership or interest."  A4995 (Royal Surplus Policy).  From the record, it appears that Aearo Technologies LLC—the Aearo entity that purportedly paid approximately $411,000 in legal fees and defense costs for the Earplug Lawsuits—may be a subsidiary of Aearo LLC.  *See, e.g.*, A3631 (Aearo Bankruptcy Court Filing) (providing schedules of assets and liabilities for Aearo LLC and displaying an organizational chart).  But unresolved questions remain as to whether this payment occurred and, if it did, what the payments specifically covered in the Earplug Lawsuits. *See Aearo Techs. LLC*, 2024 WL 3495121, at *8.

[32] A5015 (Royal Surplus Policy).

[33] A5010 (Royal Surplus Policy).

[34] In this decision we refer to Aearo Holding Corporation as Aearo Holding LLC, and Aearo Company as Aearo Technologies LLC.

11

September 30, 2008.[35]  The policy provides that ACE "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies, and which are in excess of the [SIR] stated in the Declarations."[36]

The SIR is defined as "those sums that you or any insured shall become legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies."[37]  The ACE policy further provides that the SIR

> under this policy must be satisfied by actual payment by you.  The [SIR] shall not be satisfied by payment by the insured of any deductible of any other policy or payments made on behalf of the insured by any other insurer, person or entity.  The [SIR] under this policy shall not be satisfied by any insurance coverage whatsoever.[38]

---

[35] A4885 (ACE Policy) (stating the policy period); A4912 (ACE Policy) (naming Aearo Holding Corporation and Aearo Company as the "Named Insured"); A269 (Aff. of Rani Gupta in Support of Aearo's and 3M's Partial Motion for Summary Judgment) (noting the name changes from Aearo Holding Corporation to Aearo Holding LLC and Aearo Company to Aearo Technologies LLC); A276–77 (Aearo Company's Certificate of Conversion); A286–87 (Aearo Holding Corporation's Certificate of Conversion).

[36] A4924 (ACE Policy).

[37] A4929 (ACE Policy) ("The [SIR] can only be satisfied as specified in Section III, Condition 10 hereof.").

[38] A4927 (ACE Policy).  The remainder of the provision states:  "In the event that 'bodily injury' . . . covered by this policy is also covered by any other insurance, even if such other insurance is provided by us, the insured must make actual payment of the [SIR] under this policy without regard to whether the insured must pay other [SIRs] under any other policy even if such other policy is issued by us and even if the damages claimed are deemed to have been caused by one 'occurrence.'"  *Id.*  This language is that of Section III, Condition 10, which is required to be followed per the definition of SIR in the ACE policy.  A4929 (ACE Policy).

The ACE policy states that "you" and "your" "refer to the Named Insured shown in the Declarations[.]"[39]  The "Named Insured" is Aearo Holding LLC and Aearo Technologies LLC, as well as certain subsidiaries.[40]  The SIR is $250,000 per occurrence, subject to an aggregate maximum of $1.5 million.[41]

The ACE policy contains a maintenance clause, titled "Bankruptcy; Payment of the [SIR]," which states:

> In the event of bankruptcy or insolvency of any insured, or the inability, failure, or refusal to pay the [SIR] by any insured, we will not be liable under the policy to any greater extent than we would have been liable had the insured not become bankrupt or insolvent or had such inability, failure or refusal not occurred, and this policy will not apply as a replacement for the [SIR].  You will continue to be responsible for the full amounts of the [SIR] before the limits of insurance under this policy apply.  In no case will we be required to pay the [SIR] or any portion thereof.[42]

### 2.  The Superior Court Proceedings

In November 2023, Aearo and 3M filed their operative complaint.  They seek, among other claims, a declaration that they have satisfied the SIRs in the relevant

---

[39] A4888 (ACE Policy).

[40] A4912 (ACE Policy).  The "Named Insured" includes "any organization other than a partnership or joint venture, and over which you or your subsidiary currently maintain ownership or majority interest provided there is no other similar insurance available to that organization," among other specified "organizations."  *Id.*

[41] A4945 (ACE Policy).

[42] A4926 (ACE Policy).

13

policies and that Twin City, Royal Surplus, and ACE each have a duty to "defend and/or pay for" Aearo's and 3M's defense costs arising from the Earplug Lawsuits.[43]

In early 2024, a flurry of motion practice began. Aearo and 3M filed a motion for partial summary judgment, contending that Twin City, Royal Surplus, and ACE are obligated to pay the defense costs from the Earplug Lawsuits. They argued that payments by *either* Aearo or 3M are sufficient to satisfy the applicable SIRs. Twin City then filed a motion for partial summary judgment, contending that its obligations to pay defense costs had not been triggered because the Twin City policy required Aearo, not 3M, to satisfy the SIR, and Aearo had not done so. ACE filed a notice of joinder as to Twin City's motion, contending that the same outcome follows from the ACE policy. Royal Surplus also filed a notice of joinder in Twin City's motion for the same reasons as ACE.

In July 2024, the Superior Court issued its opinion granting Twin City's motion and denying Aearo's and 3M's motion. The court determined that, under the "express language" of the Twin City, Royal Surplus, and ACE policies, "costs paid by 3M do not count towards the [SIR]."[44] The court reasoned that each policy provides that "you" or the "insured" must pay the SIR, and 3M is not an insured

---

[43] A148–49 (Am. Compl. ¶¶ 76–82). Aearo and 3M also asserted a breach-of-contract claim against Twin City, Royal Surplus, and ACE for purported breach of their duty-to-defend obligations. *See* A149–50 (Am. Compl. ¶¶ 83–88).

[44] *Aearo Techs. LLC*, 2024 WL 3495121, at *6.

14

under any of the policies.[45]   In response to Aearo's and 3M's argument that such a reading created a pointless formality, the court disagreed and stated that the "purpose of requiring that the insured pay the [SIR] is so that the insured can partially bear the costs of the risk that is being insured.  Aearo, however, seeks to credit to itself those defense costs paid for by 3M, a non-policy holder who is not bound by the [p]olicies' restrictions and requirements."[46]

Invoking the maintenance clauses, Aearo and 3M argued in the alternative that the insurers were required to provide coverage even if Aearo did not satisfy the SIRs. According to Aearo and 3M, the insurers were entitled to only a setoff in the amount of the SIR, not a denial of coverage.  The court rejected this argument and found that the maintenance clauses did not apply because Aearo and 3M had not shown that any insured was "unable to pay the [SIR] due to [its] lack of availability, collectability, invalidity, or suspension."[47]  The court granted summary judgment for Twin City and denied it for Aearo and 3M because Aearo LLC, the "Named Insured," had not made "any payment for defense costs that satisfy the [SIR], and Twin City has no obligation to provide coverage for sums in excess of the [SIR]."[48]

---

[45] *Id.*

[46] *Id.* at 7.

[47] *Id.* at 8.

[48] *Id.* at 10.  The court stated that genuine issues of material fact remain regarding satisfaction of the SIR in those policies where Aearo Technologies LLC is a "Named Insured" because Aearo and

15

Aearo and 3M moved for reargument under Superior Court Civil Rule 59(e). They contended that the court did not consider the language of ACE's and Royal Surplus's maintenance clauses, which purportedly contain language materially different from the Twin City maintenance clause and preserve coverage if Aearo did not satisfy the SIR. The court denied reargument, concluding that it did consider the language of the ACE and Royal Surplus maintenance clauses.[49]

Aearo, 3M, and Twin City thereafter filed a joint stipulation with the Superior Court under Civil Rule 54(b) requesting entry of final judgment. In September 2024, the court granted the joint stipulation based on its ruling that Twin City had no duty to pay Aearo's and 3M's defense costs for the Earplug Lawsuits.[50] Aearo and 3M have appealed the Superior Court's judgment regarding Twin City.[51]

---

3M presented some evidence that Aearo Technologies LLC paid approximately $411,000 in defense costs for the Earplug Lawsuits. *Id.* at 8.

[49] Ex. C to Suppl. Opening Br. at 3–4. The court also clarified a point from its opinion: "The [c]ourt did not so explicitly explain in its opinion but does now—Aearo's alleged refusal to pay the [SIR] also conflicted with its obligations under the Royal Surplus [p]olicy and the ACE [p]olicy that Aearo—not 3M—pay the [SIR]. Under the Royal Surplus [p]olicy and ACE [p]olicy, costs paid by 3M do not count towards the [SIR]. Neither the 'savings' [i.e., maintenance] clauses in the ACE [p]olicy nor the Royal Surplus [p]olicy modify this obligation. Indeed, the ACE [p]olicy's so-called 'savings clause' expressly states that even if Aearo refused to pay the [SIR], Aearo 'will continue to be responsible for the full amount of the [SIR].' Whether that is in the form of a setoff or not, the payments satisfying the [SIR] would come from Aearo, not 3M. These so-called 'savings' clauses say nothing about crediting the payments of a third-party to the satisfaction of the [SIR]." *Id.* at 4–5; *see also Aearo Techs., LLC v. ACE Am. Ins. Co.*, 2024 WL 3936889, at *2 (Del. Super. Aug. 26, 2024).

[50] *See* C.A. No. N23C-06-255 (Dkt. 270). The court entered judgment in favor of Twin City regarding its duty to pay defense costs. *Id.* at 4. The parties' joint stipulation stated that they resolved their dispute regarding Twin City's duty to indemnify for the Earplug Lawsuits. *Id.* at 3.

[51] No. 381, 2024.

Aearo and 3M filed an application for certification of interlocutory appeal regarding the court's ruling on Royal Surplus's and ACE's obligations to pay defense costs for the Earplug Lawsuits. The Superior Court denied the application, finding that it did not meet Supreme Court Rule 42's strict standards for certification.[52] But this Court accepted interlocutory appeal, noting that the Superior Court's opinion "addressed substantial issues of material importance to the merits of this insurance-coverage dispute, including whether 3M's payment of defense costs count toward its wholly owned subsidiaries' [SIR]."[53] The direct appeal and interlocutory appeal have since been consolidated.

## II.  STANDARD OF REVIEW

We review the Superior Court's decision to grant or deny summary judgment, as well as its interpretation of an insurance contract, *de novo*.[54]

---

[52] *See Aearo Techs. LLC v. ACE Am. Ins. Co.*, 2024 WL 4347790 (Del. Super. Sept. 26, 2024).

[53] No. 423, 2024 (Dkt. 15). We also noted that "although the language of each insurer's policy varies slightly, it appears likely that the appeal from that decision will involve consideration of the issues of which Aearo and 3M seek interlocutory review here." *Id.*

[54] *In re Alexion Pharms., Inc. Ins. Appeals*, --A.3d--, 2025 WL 383805, at *5 (Del. Feb. 4, 2025) ("We review the Superior Court's summary judgment decision *de novo*."); *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011) ("We also review the Superior Court's interpretation of an insurance contract *de novo*.").

### III. ANALYSIS

We look to the language of the contract to determine the parties' intent.[55]  If the relevant language is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[56]  A contract is not ambiguous simply because the parties do not agree on the proper construction of the relevant provisions.[57]  Instead, a contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[58]  But we will not torture the policy language "under the guise of construing it" because "creating an ambiguity where none exists

---

[55] *In re Alexion Pharms., Inc. Ins. Appeals*, 2025 WL 383805, at *5; *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009) ("When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract.").  In the Superior Court and on appeal, the parties have cited Delaware and Indiana law.  In the Superior Court, the parties agreed that there is no conflict of law between Delaware and Indiana for purposes of the issues decided on summary judgment.  *See* A237 (Aearo's and 3M's Opening Br. in Support of Their Motion for Partial Summary Judgment) ("Because Indiana and Delaware law do not conflict with respect to the issues in this motion, the [c]ourt may consider both states' legal principles."); A1496 (Twin City's Opening Br. in Support of Its Motion for Partial Summary Judgment) ("Twin City submits there is no conflict of law on any issue that this motion presents."). We thus apply general contract principles consistent with Delaware and Indiana law and do not engage in a choice-of-law analysis.  *See e.g.*, *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 892 (Del. 2000) (applying "general insurance contract principles" "consistent with the laws of either New York or Illinois"); *Deuley v. DynCorp. Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (noting that when "the result would be the same" under both jurisdictions' laws, "the Court should avoid the choice-of-law analysis altogether." (internal quotation marks omitted)).

[56] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021); *Carfield*, 914 N.E.2d at 318 ("If the language is clear and unambiguous, we give the language its plain and ordinary meaning.").

[57] *Murdock*, 248 A.3d at 905; *Carfield*, 914 N.E.2d at 318 ("[A]n ambiguity does not exist merely because the parties proffer different interpretations of the policy language.").

[58] *Murdock*, 248 A.3d at 905–06; *Carfield*, 914 N.E.2d at 318 ("An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning.").

18

could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented."[59]

## A.    The meaning of "You":  Aearo had to satisfy the SIRs.

Aearo's and 3M's primary contention on appeal is that the Superior Court erred when it held that the policies' language precluded 3M—Aearo's corporate parent—from satisfying the SIRs on Aearo's behalf.  Twin City, Royal Surplus, and ACE argue that each policy unambiguously requires that "you" must satisfy the SIR, "you" is defined as the "Named Insured," and 3M is not a "Named Insured" under any policy.

"Where the insured and another defendant are jointly and severally liable for injury or damage, an SIR under the insured's liability policy may be satisfied by payments made by the other defendant or its liability insurer . . . unless the policy clearly provides otherwise."[60]  Here, the relevant language in each policy unambiguously provides otherwise—Aearo had to satisfy the SIRs.

The Twin City policy states that the SIR is the "amount you or any insured must pay as damages and 'claim expenses' . . ., before [Twin City] pays anything."[61]

[59] *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) (cleaned up); *see also ConAgra Foods, Inc.*, 21 A.3d at 69 (same).

[60] *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 105 Cal. Rptr. 3d 200, 207 (Cal. Ct. App. 2010) (alterations in original).

[61] A1020 (Twin City Policy).

19

"You" is defined as the "Named Insured."[62] The "Named Insured" is Aearo LLC.[63] The policy unambiguously states that "you" must satisfy the SIR, and "you" is Aearo LLC. This reading is further supported by the remainder of the SIR, which states that it "shall not be reduced by . . . [a]ny payment made on your behalf by another, including any payment from any other applicable insurance."[64] For purposes of the Twin City policy, 3M is "another" because 3M is not specifically designated as a "Named Insured." There is no record evidence that Aearo LLC paid anything to satisfy the SIR.

The Royal Surplus policy states that the SIR is "the amount . . . which you are obligated to pay and only includes damages otherwise payable under this policy."[65] "You" is defined as the "Named Insured."[66] The "Named Insured" is Aearo LLC, as well as "[a]ll subsidiary and affiliated entities or successors, as may now or hereafter exist by way of acquisition, merger, formation or transformation in which [Aearo LLC] has at least 51% ownership or interest."[67] Thus, the Royal Surplus policy unambiguously states that Aearo LLC—or a majority-owned subsidiary—must

---

[62] A1004 (Twin City Policy).

[63] A1035, A1003 (Twin City Policy); A269 (Aff. of Rani Gupta in Support of Aearo's and 3M's Partial Motion for Summary Judgment) (noting the name change from Aearo Corporation to Aearo LLC); A273–74 (Aearo Corporation's Certificate of Conversion).

[64] A1020 (Twin City Policy).

[65] A5015 (Royal Surplus Policy).

[66] A5020 (Royal Surplus Policy).

[67] A4984, A4995 (Royal Surplus Policy).

satisfy the SIR.  Under the plain language of the Royal Surplus policy, 3M is not a "Named Insured" and cannot satisfy the SIR.[68]

The ACE policy states that the SIR "must be satisfied by actual payment by you."[69]  "You" means the "Named Insured."[70]  The "Named Insureds" are Aearo Holding LLC and Aearo Technologies LLC.[71]  The "Named Insureds" also include certain subsidiary entities.[72]  The ACE policy clearly provides that Aearo Holding LLC, Aearo Technologies LLC, or certain subsidiaries must satisfy the SIR.  The ACE policy further states that the SIR "shall not be satisfied by payment by the insured of any deductible of any other policy or payments made on behalf of the

---

[68] Aearo and 3M submitted an affidavit with its summary judgment briefing that Aearo Technologies LLC paid approximately $411,000 in defense costs for the Earplug Lawsuits and that Aearo Technologies LLC is a subsidiary of Aearo LLC.  But the Superior Court did not resolve whether this payment occurred and, if it did, to which policy period it applied.

[69] A4927 (ACE Policy).

[70] A4888 (ACE Policy).

[71] A4912 (ACE Policy) (naming Aearo Holding Corporation and Aearo Company as the "Named Insured"); A269 (Aff. of Rani Gupta in Support of Aearo's and 3M's Partial Motion for Summary Judgment) (noting the name changes from Aearo Holding Corporation to Aearo Holding LLC and Aearo Company to Aearo Technologies LLC); A276–77 (Aearo Company's Certificate of Conversion); A286–87 (Aearo Holding Corporation's Certificate of Conversion).

[72] A4912 (ACE Policy) (noting that the "Named Insured" includes "any organization other than a partnership or joint venture, and over which you or your subsidiary currently maintain ownership or majority interest provided there is no other similar insurance available to that organization," among other specified "organizations").

21

insured by any other insurer, person or entity."[73]  Under the ACE policy, 3M is "any

other . . . entity" because 3M is not a "Named Insured."[74]

The clear meanings of "you" and "Named Insured," and requirements of the

SIRs, do not permit more than one reasonable reading—3M is not a "Named

Insured" under any policy and cannot satisfy the SIRs.

We disagree with Aearo and 3M that this reading creates "unintended and

pointless requirements."[75]  First, when the relevant policy language is unambiguous,

as here, we find the parties' intent in the plain meaning of the language.[76]  The

language plainly states that the "Named Insured" under each policy was required to

satisfy the respective SIRs.  3M is not a "Named Insured" under any policy.  The

Royal Surplus and ACE policies also explicitly state that certain subsidiary entities

of the "Named Insured" can satisfy the SIRs.  Second, we respect the separateness

of distinct legal entities.  Although 3M is the corporate parent, the Aearo entities are

each distinct legal entities, and, absent specific circumstances not present here, we

will not disregard that distinction.[77]

---

[73] A4927 (ACE Policy).

[74] As with the Royal Surplus policy, there are unresolved questions as to whether Aearo Technologies LLC's purported payments satisfied the SIR for the ACE policy.

[75] Opening Br. at 21.

[76] *In re Alexion Pharms., Inc. Ins. Appeals*, 2025 WL 383805, at *5 ("We look to the contract language to determine the parties' intent."); *Carfield*, 914 N.E.2d at 318 ("If the language is clear and unambiguous, we give the language its plain and ordinary meaning.").

[77] *See Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978) ("Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a

## B.  The SIRs function as conditions precedent to the insurers' coverage obligations.

Aearo and 3M contend that the SIRs do not act as conditions precedent to the insurers' coverage obligations, meaning that, even if Aearo was required to satisfy each SIR, Aearo's failure to satisfy each SIR does not result in a failure to trigger coverage.  Twin City, Royal Surplus, and ACE respond that the SIRs operate as conditions precedent to coverage, and their respective coverage obligations are not triggered unless and until Aearo satisfies the SIR of the policy for which Aearo seeks coverage.

It is helpful to understand the nature of an SIR.  An SIR is "[t]he dollar amount specified in a liability-insurance policy to be paid by the insured before the insurer will respond to a loss."[78]  "An insured maintains a[n] SIR to reduce the cost of

---

separate corporate entity[.]"); *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 1992 WL 127567, at *10 n.11 (Del. Ch. May 28, 1992) ("Our law tends to accord dignity to legal entities except in cases in which the traditional law of piercing the corporate veil is met."); *Am. Bottling Co. v. BA Sports Nutrition, LLC*, 2021 WL 6068705, at *12 (Del. Super. Dec. 15, 2021) ("[R]espect for and recognition of corporate separateness [] is an essential part of . . . Delaware law."); *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 2455987, at *4 (Del. Ch. July 6, 2022) (stating that Delaware law has a "high bar for blurring corporate separateness"); *Barbey v. Cerego, Inc.*, 2023 WL 6366055, at *9 (Del. Ch. Sept. 29, 2023) ("Delaware law respects corporate separateness."); *see also, e.g.*, *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994) ("Indiana courts are extremely reluctant to disregard corporate identity and certainly the mere fact of a subsidiary-parent relationship is not, without more, sufficient reasons to piece the corporate veil."); *CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1281 (Ind. Ct. App. 2012) ("Courts are reluctant to disregard corporate identity[.]").  Although these cases mostly concern piercing the corporate veil, the general premise holds—Delaware and Indiana respect the distinction of separate legal entities.

[78] *Self-Insured Retention*, Black's Law Dictionary (12th ed. 2024).

23

premiums on its insurance policy."[79] "Typically, the excess insurer's obligations do not arise until the primary limits or the SIR have been exhausted."[80] Simply put, an SIR "refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy."[81]

An SIR is different from a deductible. "[A] policy with a deductible obliges the insurer to respond to a claim from 'dollar one' (i.e., immediately upon tender), subject to the insurer's right to later recoup the amount of the deductible from the insured."[82] By contrast, "[a] policy subject to a[n] SIR . . . obliges the policyholder itself to absorb expenses up to the amount of the SIR, at which point the insurer's obligation is triggered."[83]

---

[79] Susan N.K. Gummow, *No "Sir"! Insurer Can't Avoid Payment if Insured Files for Bankruptcy*, Am. Bankr. Inst. J., Apr. 2005, at 18; *see also Walsh Constr. Co. v. Zurich Am. Ins. Co.*, 72 N.E.3d 957, 963 (Ind. Ct. App. 2017) (citing the Gummow article); *Self-Insured Retention*, Black's Law Dictionary (12th ed. 2024) ("As with large deductibles, a[n] [SIR] can lower the premiums paid."); Restatement of the Law of Liability Insurance § 1 cmt. d (Oct. 2024 Update) ("Large commercial enterprises frequently arrange their insurance programs to include large [SIRs] in order to reduce premiums, increase policy limits, or retain greater control over claims adjustment and defense."). Black's Law Dictionary provides an illustration of this principle: "the defendant had a $1 million liability policy to cover the loss, but had to pay a[n] [SIR] of $100,00 first, which it had agreed to so that the policy premium would be lower." *Self-Insured Retention*, Black's Law Dictionary (12th ed. 2024).

[80] Susan N.K. Gummow, *No "Sir"! Insurer Can't Avoid Payment if Insured Files for Bankruptcy*, Am. Bankr. Inst. J., Apr. 2005, at 18.

[81] *Forecast Homes, Inc.*, 105 Cal. Rptr. 3d at 206 (emphasis in original); *Centex Homes v. Lexington Ins. Co.*, 2014 WL 6673481, at *4 (C.D. Cal. Nov. 24, 2014) (same).

[82] *Walsh Constr. Co.*, 72 N.E.3d at 962 (quoting *Allianz Ins. Co. v. Guidant Corp.*, 884 N.E.2d 405, 410 n.2 (Ind. Ct. App. 2008)).

[83] *Id.* (quoting *Allianz Ins. Co.*, 884 N.E.2d at 410 n.2); *see also In re September 11th Liab. Ins. Coverage Cases*, 333 F. Supp. 2d 111, 124 n.7 (S.D.N.Y. 2004) ("A[n] SIR differs from a deductible in that a[n] SIR is an amount that an insured retains and covers before insurance

"[A]s between an insurer and a single insured, the insurer's responsibilities arise only '[a]fter the [SIR] amounts specified in the policies are satisfied.'"[84] "[I]t is the responsibility of the policyholder to prove this condition precedent to coverage—SIR exhaustion—and unless and until it is able to do so, the duty to defend is not triggered."[85]

Considering the purpose of SIRs, we conclude that each one in this case functions as a condition precedent to the respective insurer's coverage obligations.[86]

---

coverage begins to apply. Once a[n] SIR is satisfied, the insurer is then liable for amounts exceeding the retention.").

[84] *Walsh Constr. Co.*, 72 N.E.3d at 963 (quoting *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 576–77 (Ind. 2007)).

[85] *Id.* (quoting *Allianz Ins. Co.*, 884 N.E.2d at 420); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1198 (Del. 1992) ("In order for an insured to establish the contractual liability of an insurer for breach of an insurance contract, the insured must show that he has complied with all conditions precedent to the insurer's performance."); Restatement of the Law of Liability Insurance § 1 ("Unless otherwise stated in the insurance policy, an insurer has no duty to defend or indemnify the insured until the insured has paid any applicable [SIR]."); 23 Williston on Contracts § 63:6 (4th ed.) (May 2025 Update) ("[T]he failure to comply with conditions precedent ordinarily prevents an action to enforce the contract by the party failing to comply.").

[86] In its supplemental opening brief, Aearo and 3M argue that the ACE and Royal Surplus SIRs should not be treated as conditions precedent. For that proposition, Aearo and 3M rely on *Lasorte v. Those Certain Underwriters at Lloyd's*, 995 F. Supp. 2d 1134 (D. Mont. 2014), which held that "[i]f the insurer intends to make actual payment *in cash* of the [SIR] a condition precedent to liability on its policy, then it can include specific language to that effect in the policy." *Id.* at 1143 (emphasis added). But the issue in *Lasorte* concerned the form of payment and not the payment itself—whether the SIR could be satisfied by a stipulated judgment instead of cash. *Id.* at 1140. Aearo and 3M also rely on *Phillips v. Noetic Specialty Insurance Co.*, 919 F. Supp. 2d 1089 (S.D. Cal. 2013), for the same proposition. But *Phillips* concerned an insurer's coverage obligations where the insured did not satisfy the SIR due to the insured's insolvency. *Id.* at 1098–99 ("[The insurer]'s contentions urge the [c]ourt to relieve it of all obligations under the policy based on [the insured]'s insolvency and resulting failure to pay the SIR. . . . Adopting [the insurer]'s interpretation of the policy and requiring payment of the SIR to trigger coverage, even in the event of the insured's insolvency, is contradictory to the language of the policy . . . and would also

25

As established above, the summary judgment record is undisputed that Aearo LLC—the "Named Insured" under the Twin City policy—did not satisfy that policy's SIR. Twin City's obligations have not been triggered. Although the Royal Surplus and ACE SIRs also act as conditions precedent, there remain unresolved questions as to whether those SIRs have been satisfied. Namely, Aearo Technologies LLC averred that it paid approximately $411,000 in defense costs for the Earplug Lawsuits. Aearo Technologies LLC is a "Named Insured" under the ACE policy and appears to be a "Named Insured" under the Royal Surplus policy. But the record does not establish the specifics of that $411,000 payment. So questions remain regarding whether Aearo Technologies LLC satisfied the SIRs under the Royal Surplus or ACE policies.

During oral argument, our colleague in dissent asked Aearo's and 3M's counsel whether this Court's recent decision in *Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*,[87] bears on this case. In *Thompson Street*, we held that, under certain circumstances, a court may excuse a party's noncompliance with a condition precedent if the party "demonstrates that the condition precedent was not a material part of the agreement and satisfies the

conflict with the public policy as reflected by California's direct action statute."). None of the Aearo entities are insolvent.

[87] *Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, --A.3d--, 2025 WL 1213667 (Del. Apr. 28, 2025).

requirements for disproportionate forfeiture."[88]  We disagree with the dissent that "principles of fairness" mandate a remand to consider *Thompson Street*.  This issue was not raised below because we decided *Thomspon Street* after the parties completed appellate briefing.  But Aearo and 3M could have followed our Court rules and called *Thompson Street* to our attention before argument.[89]  They also could have requested supplemental briefing to explore the issue.  In our view, the time to consider *Thompson Street* in this appeal has passed.  We should be especially reticent to take up new issues for the first time on appeal that might impact settled interpretive principles in the insurance field.

### C.  The maintenance clauses do not apply.

Aearo and 3M advance an alternative argument:  even if specific Aearo entities, not 3M, had to satisfy each SIR, the maintenance clause in each policy establishes that Aearo's failure to satisfy each SIR means only that each insurer has a setoff equal to the SIR and still must pay those defense costs exceeding the setoff.  Stated differently, they argue that failure to satisfy the SIRs does not affect coverage.  Instead, they contend that the insurers are required to pay for all defense costs, minus the amount that the insureds owe for the SIRs.  We disagree.

---

[88] *Id.* at *17, *20.

[89] *See* Del. Supr. Ct. R. 15(a)(vi) ("A party may, by letter to the Clerk, bring to the Court's attention pertinent cases decided after a party's final brief is filed or after the case is under submission for decision.  The letter shall identify the arguments to which the cases relate and provide copies of the cases to the Court and opposing counsel.  The letter shall not contain any argument.").

27

The maintenance clause in each provision serves two purposes: to ensure that (a) bankruptcy or insolvency of Aearo does not relieve the respective insurer of its coverage obligations, and (b) the insurer's coverage obligations do not drop down if Aearo fails to maintain the SIR.[90] Neither helps Aearo and 3M, who seek to turn these provisions into setoffs for Aearo's failure to satisfy the SIRs.

Indiana law—one of the two states' laws relevant to this case—has codified the bankruptcy requirement of these clauses. Indiana Code Section 27-1-13-7 states that "[n]o policy of insurance against . . . loss or damages resulting from accident to; or . . . death or injury suffered by[] an employee or other person or persons and for which the person or persons insured are liable . . . shall be issued" in Indiana by an insurance carrier "unless" the policy contains a provision that "the insolvency or bankruptcy of the person or persons insured shall not release the insurance carrier

---

[90] *See* A1015 (Twin City Policy) (stating that the "Maintenance of the [SIR]" clause requires Aearo LLC to "do whatever is required, including provision of sufficient funds, to maintain the [SIR] . . . .. If the [SIR] becomes invalid, suspended, unenforceable or uncollectable for any reason, including bankruptcy or insolvency, we shall be liable only to the extent we would have been had such [SIR] remained in full effect"); A5010 (Royal Surplus Policy) (stating that the "Non Drop Down Bankruptcy or Insolvency of the Named Insured" requires that "if the [SIR] is not available or collectible because of (a) the bankruptcy or insolvency of the named insured or (b) the inability or failure for any other reason of the named insured to comply with the provisions of the [SIR] endorsement, then this policy should apply . . . as if such [SIR] were available and collectible"); A4926 (ACE Policy) (stating that the "Bankruptcy; Payment of the [SIR]" clause requires that "[i]n the event of bankruptcy or insolvency of any insured, or the inability, failure, or refusal to pay the [SIR] by any insured, we will not be liable under the policy to any greater extent than we would have been liable had the insured not become bankrupt or insolvent or had such inability, failure or refusal not occurred . . .. You will continue to be responsible for the full amounts of the [SIR] before the limits of insurance under this policy apply. In no case will we be required to pay the [SIR] or any portion thereof").

28

from the payment of damages for injury sustained or loss occasioned during the life of the policy."[91]  This statutory provision "embodies the public policy of permitting an injured victim to recover under a valid insurance policy from the insurer itself in the event the insured is unable to pay due to its insolvency or bankruptcy."[92] Additionally, a "[m]aintenance [c]lause is designed to protect an excess insurer by establishing that its coverage will not 'drop down' in the event that the insured fails to maintain a lower level policy or the lower level policy is invalidated."[93]

---

[91] Ind. Code § 27-1-13-7.  The statute also provides that if "execution against the insured is returned unsatisfied in an action brought by the injured person . . . because of insolvency or bankruptcy . . . then an action may be maintained by the injured person" against the insurance carrier "under the terms of the policy for the amount of the judgment in the said action not exceeding the amount of the policy."  *Id.*; *see also In re FairPoint Ins. Coverage Appeals*, 311 A.3d 760, 772 (Del. 2023) (interpreting a standard bankruptcy provision in an insurance policy and stating that the "bankruptcy provision protects contractual rights as they existed outside of bankruptcy from being altered by bankruptcy").

[92] *In re Federal Press Co., Inc.*, 104 B.R. 56, 63 (Bankr. N.D. Ind. 1989); *see also Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716, 747 (Cal. Ct. App. 2006) ("The primary purpose of the statute [codifying bankruptcy provisions under California law] is to protect an injured person when the insured is bankrupt or insolvent."); Theresa A. Guertin & Tracy Alan Saxe, *Insurance Coverage of Construction Disputes* § 46:4 (2d ed.) (June 2025 Update) ("CGL policies generally contain a provision in the conditions section of the policy to the effect that bankruptcy or insolvency of the insured does not relieve the insurer of its obligation under the policy.").  Even in states where bankruptcy provisions are not codified by statute, public policy still has dictated the same result.  *See, e.g.*, *Rosciti v. Ins. Co. of Pennsylvania*, 659 F.3d 92, 98 (1st Cir. 2011) (stating that Rhode Island does not have a bankruptcy provision codified by statute but "[n]evertheless, it is clear that Rhode Island's public policy is to prevent insurance companies from avoiding their obligations when an insolvent insured cannot make expenditure towards discharging liability."); *In re Vanderveer Ests. Hldg., LLC*, 328 B.R. 18, 25 (Bankr. E.D.N.Y. 2005) ("[C]ase law interpreting [] the Bankruptcy Code makes it clear that even in the absence of an applicable statutory provision, the failure of a bankrupt insured to fund a[n] [SIR] does not relieve the insurer of the obligation to pay claims under the policy.").

[93] *In re Rapid-Am. Corp.*, 2016 WL 3292355, at *11 (Bankr. S.D.N.Y. June 7, 2016) (citing *JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 930 N.Y.S.2d 175, 2011 WL 2320087, at *8 (N.Y. Sup. Ct. May 26, 2011)).

Aearo's and 3M's argument rings hollow given the purposes of this type of clause. The maintenance clauses are triggered in situations where the insured is in financial distress or where the insured has not maintained a lower-level policy. Admittedly, Aearo has not maintained the "lower-level policy" in that it has not satisfied the SIRs. But in this circumstance, the maintenance clause protects an insurer from dropping down and expanding its coverage obligations to liability not within the specific policy's purview. The clause does not, as Aearo and 3M suggest, protect the insured by creating a setoff if the insured fails to satisfy the SIR. Aearo and 3M have not cited any case where satisfaction of the SIR is excused, and a maintenance clause applies to create a setoff, where a non-"Named Insured" attempted to satisfy the SIR despite that the policy prohibited it and the "Named Insured" is financially healthy.[94] And if we read these clauses to create setoffs, that

---

[94] Aearo and 3M rely on *Liberty Mutual Insurance Co. v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466 (Ala. 2002). There, the Alabama Supreme Court determined that, based on the policy language in that case, the insured was entitled to a "setoff" equal to the amount of that policy's SIR. *Id.* 487. But the insured in *Wheelwright* filed for Chapter 11 protection and, during the pendency of the bankruptcy proceedings, entered into a consent judgment with an injured party in an amount exceeding the policy's SIR and that conditioned recovery "to the extent that the [insured's] insurance provides coverage." *Id.* at 470–71. The insurers received notice of the consent judgment and did not object. *Id.* at 479. The Alabama Supreme Court's determination that the insured was entitled to a setoff and that the insurers were required to provide coverage in excess of the setoff cannot be separated from the fact that the insured had filed for bankruptcy protection. Similar to *Phillips*, *Wheelright* is factually distinct because none of the Aearo entities are bankrupt or insolvent.

reading would render meaningless the condition precedent nature of the SIRs, which is not how we interpret contracts.[95] These clauses do not apply in this case.

The dissent states that the maintenance clauses, "at a minimum, inject[] further ambiguity into the parties' intent and exposes the trial court's error in interpreting the SIR provisions as unambiguous conditions precedent." But the language of the clauses must be viewed through the appropriate lens. That is, they are triggered in specific instances, none of which are present here. The maintenance clauses do not inject ambiguity into the SIRs.

The dissent also appears to frame our interpretation of these clauses as applying only in "the context of insolvency or financial distress." Based on that framing, the dissent states that our interpretation "render[s] superfluous whole portions of the maintenance clause." But that framing is not accurate. As previously stated, a key aspect of these clauses is the "maintenance" aspect, which protects an insurer from dropping down and expanding its coverage obligations to a lower-level policy.[96] Here, the SIRs act as those lower-level policies.

---

[95] *See In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 575 (Del. 2019) ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (internal quotation marks omitted)); *Thomas v. Valpo Motors, Inc.*, 258 N.E.3d 236, 241 (Ind. 2025) ("When interpreting a contract, [the Indiana Supreme Court] reviews the document as a whole, seeking to determine the parties' intent while making every attempt to construe the contract's language so as not to render any words, phrases, or terms ineffective or meaningless." (internal quotation marks omitted)).

[96] *See In re Rapid-Am. Corp.*, 2016 WL 3292355, at *11 ("A [m]aintenance [c]lause is designed to protect an excess insurer by establishing that its coverage will not 'drop down' in the event that the insured fails to maintain a lower level policy or the lower level policy is invalidated."); *Playtex*

31

## IV.   CONCLUSION

The policies unambiguously required certain Aearo entities to satisfy each SIR.  The policies also specifically identified which entities in the corporate hierarchy could satisfy the SIR or stated that the SIR could not be satisfied by "another."  No policy identified 3M as an entity that could satisfy the SIR.  So 3M's payments of defense costs did not trigger coverage under the policies issued to Aearo.  This result reflects our practice of enforcing unambiguous contracts as written and respecting corporate separateness.  We affirm the Superior Court's decision granting summary judgment for Twin City.  We also affirm the Superior Court's interpretation of the relevant provisions in the Royal Surplus and ACE policies.

---

*FP, Inc. v. Columbia Cas. Co.*, 622 A.2d 1074, 1085 (Del. Super. 1992) ("Keeping in mind that [the maintenance clause] of the [insurer's] policy is a condition meant to obligate the insured to maintain its underlying insurance, it is clear that the provision is not intended to expand the insured's coverage and force the excess insurers to drop down.").

**LEGROW, J. dissenting, joined by TRAYNOR, J.:**

The insurers have framed this appeal as requiring this Court to decide whether payment of a self-insured retention by a corporate parent satisfies an insurance policy's requirement that the insured—the parent's wholly-owned subsidiary—pay the retention. I view the question somewhat differently. The critical question from my perspective is whether satisfaction of the self-insured retention was a condition precedent to the insurers' coverage obligations and, if so, whether the failure of that condition as a result of the parent's payment should result in a complete forfeiture of the coverage for which the insured paid premiums.

In the absence of unambiguous contractual language creating a condition precedent, our law avoids construing a contract as containing conditions whose nonoccurrence results in the forfeiture of a contractual obligation. And when a disproportionate forfeiture would otherwise result from the nonoccurrence of a condition that is not material, forfeiture may be excused. Questions of proportionality and materiality are fact intensive and layered. The Majority Opinion concludes that the self-insured retention provisions are conditions precedent despite language in the policies that supports the opposite conclusion. And after finding that a forfeiture of coverage results because the retention was paid by the wrong entity, the Majority does not address whether the factors for excusal are met. I therefore respectfully dissent.

With slight variations, the policies define the SIR[1] and refer to the SIR being paid only by Aearo or certain of its subsidiaries, rather than another party, including another insurer.[2] For example, the Twin City policy defines the SIR as "the amount you or any insured must pay as damages and 'claim expenses' . . ., before [Twin City] pays anything."[3] "You" refers to Aearo LLC, and it is undisputed that 3M is not an insured under the Twin City policy. Similarly, the Royal Surplus policy defines the SIR as "the amount . . . which you are obligated to pay"[4] and states that Royal Surplus's obligation to pay damages on "your" behalf applies only to amounts that exceed the SIR.[5] "You" and "your" refer to Aearo LLC and certain of its subsidiaries.[6] Likewise, the ACE policy provides that ACE will pay damages in

---

[1] Unless otherwise noted, I adopt the defined terms used by the Majority.

[2] My colleagues in the Majority thoroughly summarized the factual background of this case, which I will not belabor. But the chronology of the events is important to a complete understanding of the policy language. The earplugs that were the subject of the underlying litigation were designed and developed by Aearo in the late 1990s. Aearo obtained the insurance policies at issue in this case before—in most cases many years before—3M acquired Aearo in April 2008, and the policies almost exclusively covered periods in which 3M was a stranger to Aearo. It is therefore not surprising that the policies' language does not expressly refer to 3M or address the parent-subsidiary relationship that would later develop between 3M and Aearo. *See* App. to Opening Br. at A1380 (Commercial General Liability Policy Declarations for ACE American Insur. Co. covering the period from September 30, 2007 to September 30, 2008) [hereinafter A___]; A945 (Royal Insurance Common Policy Declarations covering the period from 1997 to 2000); A997 (Excess General Liability Insurance Policy issued by Twin City Fire Insur. Co. covering the period from 2000 to 2001).

[3] A1020 (Twin City Policy).

[4] As the Majority Opinion notes, the Royal Surplus policy refers to the SIR as the "Retained Limit."

[5] A5015 (Royal Surplus Policy).

[6] A4984 (Royal Surplus Policy).

2

excess of the SIR and states that the SIR must be satisfied by "actual payment by you."[7]  As with the other two policies, "you" refers to Aearo LLC and certain subsidiaries.[8]

The trial court treated this language as creating a condition precedent capable of working a forfeiture of Aearo's insurance coverage, and the Majority Opinion adopts that position.  But that conclusion, in my view, is at odds with two established principles of Delaware law: first, that conditions precedent must be clearly and unambiguously stated; and second, that our common law abhors a forfeiture.  The policies' language can be interpreted to avoid the conclusion that the SIRs operated as conditions precedent to the insurers' coverage obligations, and the trial court therefore should have avoided a construction that created conditions precedent from ambiguous contractual terms.

A condition precedent is "an act or event, other than a lapse of time, that must exist or occur *before* a duty to perform something promised arises."[9]  Because the nonoccurrence of a condition precedent may cause a forfeiture, our law requires a

---

[7] A4924, A4927, A4929 (ACE Policy).

[8] A4945 (ACE Policy).

[9] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021) (quoting *Thomas v. Headlands Tech Principal Hldgs, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Sept. 22, 2020) (emphasis added) (internal quotation marks omitted)).

condition precedent to be stated clearly and unambiguously.[10]  That rule balances Delaware's contractarian principles and its contempt for forfeitures.[11]  Where contractual language does not plainly provide for a forfeiture, a court should avoid interpreting a contract as creating one.[12]

There is no single method that contracting parties must employ to create a condition precedent, and they need not expressly use the phrase "condition precedent" to establish one.  Our courts closely examine contractual language to determine whether the parties intended to create a condition, the nonoccurrence of which would result in forfeiture.  But certain contractual elements typically signal the existence of a condition precedent, and their absence weighs against finding such a condition.  For example, when parties create a contractual condition and expressly identify a consequence for failing to satisfy it, such language supports a conclusion that the contractual provision is a condition precedent capable of working a

---

[10] *QC Hldgs v. Allconnect*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018); *see also Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at *11 (Del. Super. Aug. 31, 2023).

[11] *Thompson St. Capital Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, --- A.3d ---, 2025 WL 1213667, at *10 (Del. 2025).  *See also Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 692 (Del. 2024); *XRI Inv. Hldgs LLC v. Holifield*, 283 A.3d 581, 661 (Del. Ch.) ("The common law also resists outcomes that result in a forfeiture."), *judgment entered,* (Del. Ch. 2022), and *aff'd in part, rev'd in part and remanded on other grounds,* 304 A.3d 896 (Del. 2023); *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970) ("Equity ... abhors a forfeiture."); *see Garrett v. Brown*, 1986 WL 6708, at *8 (Del. Ch. June 13, 1986) ("Forfeitures are not favored and contracts will be construed to avoid such a result."), *aff'd*, 511 A.2d 1044 (Del. 1986); *Clements v. Castle Mortg. Serv. Co.*, 382 A.2d 1367, 1370 (Del. Ch. 1977) ("Forfeiture as such is highly disfavored by the courts, including those of Delaware.").

[12] *Thompson St.*, 2025 WL 1213667, at *10 (quoting *QC Holdings*, 2018 WL 4091721, at *7).

forfeiture.[13]  Conversely, when the contract is silent as to the consequences of failing to satisfy a condition, a court may decline to find a condition precedent.[14]  Similarly, employing the phrase "unless or until," or even the word "unless," may be viewed as "unmistakable language of condition."[15]  But as with all contracts, we look to the language of the policy to discern the parties' intent, not to a "generic standard."[16]

The trial court did not evaluate whether the policies contained express language of condition but instead limited its analysis to whether payments by 3M satisfied the terms of the SIR provisions.  The Majority Opinion expressly holds that the SIR provisions "function as conditions precedent to the insurers' coverage obligations,"[17] but the Majority rests that conclusion on the "nature of an SIR," citing various treatises and out-of-state cases.[18]  The insurers do not identify language, like that described above, that unambiguously identifies satisfaction of the SIR as a condition precedent.

---

[13] *Thompson St.*, 2025 WL 1213667, at *14 (citing *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460 (Del. Super. Sept. 29, 2021); *Aveanna*, 2021 WL 3235739, at *25; *Ewell v. Those Certain Underwriters of Lloyd's, London*, 2010 WL 3447570, at *1 (Del. Super. Aug. 27, 2010)).

[14] *Id.* (citing *Blue Cube*, 2021 WL 4453460, at *2).

[15] *Id.* at *15 n.112.

[16] *See, e.g. Origis USA LLC v. Great Am. Insur. Co.*, --- A.3d ---, 2025 WL 2055767, at *12 (Del. 2025); *First Solar, Inc. v. Nat'l Union Fire Insur. Co. of Pittsburgh*, 274 A.3d 1006, 1013 (Del. 2022).

[17] Maj. Op. at 23.

[18] Maj. Op. at 23–26.

The absence of this express language weighs against interpreting the SIR provisions as creating a condition precedent to coverage. But even if those provisions, read in isolation, could be interpreted as unambiguously creating a condition precedent, Delaware law requires courts to read a contract as a whole, giving meaning to each term and avoiding an interpretation that would render any provision "mere surplusage."[19] In this case, each of the policies contains a maintenance clause—which Aearo and 3M refer to as a "savings clause"—that, at a minimum, injects further ambiguity into the parties' intent and exposes the trial court's error in interpreting the SIR provisions as unambiguous conditions precedent.

Each of the maintenance clauses uses different language, but each clause confirms that the parties did not intend for a failure to satisfy the SIR to work a forfeiture. The Majority Opinion shelves these clauses by drawing conclusions about the "purposes" served by the clauses and concluding that they are "triggered in situations where the insured is in financial distress or where the insured has not maintained a lower-level policy."[20] But that interpretation does not hew to the contractual language. The maintenance clauses in the Royal Surplus and ACE policies are particularly broad. The Royal Surplus clause states:

---

[19] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[20] Maj. Op. at 28–30.

> [I]f the [SIR] is not available or collectible because of (a) the bankruptcy or insolvency of the named insured or (b) ***the inability or failure for any other reason of the named insured to comply with the provisions of the [SIR] endorsement***, then this policy should apply (and amounts payable hereunder shall be determined) as if such [SIR] were available and collectible.[21]

Using equally broad language, the ACE policy states:

> In the event of bankruptcy or insolvency of any insured, ***or the inability, failure, or refusal to pay the [SIR] by any insured***, we will not be liable under the policy to any greater extent than we would have been liable had the insured not become bankrupt or insolvent or had such inability, failure or refusal not occurred, and this policy will not apply as a replacement for the [SIR]. You will continue to be responsible for the full amounts of the [SIR] before the limits of insurance under this policy apply. In no case will we be required to pay the [SIR] or any portion thereof.[22]

Although the Twin City clause is not as broadly phrased, it also states that "[i]f the [SIR] becomes invalid, suspended, ***unenforceable or uncollectable for any reason***, including bankruptcy or insolvency, we shall be liable only to the extent we would have been had such [SIR] remained in full effect."[23]  Each of the clauses contains unambiguous language that applies outside the context of insolvency or financial distress, and each confirms that the insurers' coverage obligations are not excused if there is a "failure" to pay the SIR (in the case of Royal Surplus and ACE)

---

[21] A5010 (Royal Surplus Policy) (emphasis added).

[22] A4926 (ACE Policy) (emphasis added).

[23] A1015 (Twin City Policy) (emphasis added).

or if the SIR is "uncollectable for any reason" (in the case of Twin City).[24] The insurers' attempt to cabin these clauses as "bankruptcy clauses" would render superfluous whole portions of the maintenance clauses, a result that our case law requires us to avoid if possible.[25]

Finally, even if the SIR provisions were conditions precedent capable of working a forfeiture of coverage, this case should be remanded to the trial court to consider whether forfeiture was excused under the circumstances. In *Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, this Court held that if contractual language clearly provides for a forfeiture, "then a

---

[24] The record supports a finding that Aearo did not have its own bank account or separate assets once 3M acquired it, which would prevent it from satisfying the SIR from its own accounts.

[25] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019); *Osborn* 991 A.2d at 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.") (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)); *see also* Restatement (Second) of Contracts § 203 (Am. Law Inst. 1981) ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *id.* cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous."). The majority maintains that reading the maintenance clauses as creating setoffs, as Aearo and 3M urge, would "render meaningless the condition precedent nature of the SIRs." *See* Maj. Op. at 31. I view that reasoning as circular, since in my view the maintenance clauses confirm that the SIRs are not conditions precedent. And the clauses can be read in harmony without one rendering the other superfluous: the insured remains liable for the SIR, and no coverage obligation arises until damages exceed the SIR, but the insurers' obligation to provide coverage above the SIR is not excused by the insured's failure to pay. *See, e.g. Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466, 487 (Ala. 2002) ("Thus, under the terms of the SIR Provision in [the insurer's] policy, payment of the SIR cannot be viewed as a condition precedent to [the insurer's] obligation under the policy. Rather, the policy states that [the insurer] will be responsible for all covered liability in excess of the SIR, up to the policy limits.").

court may consider whether compliance with the condition may be excused" if the forfeiture would be disproportionate and the occurrence of the condition was not a material part of the agreed exchange.[26] *Thompson Street* identifies several factors that a court may apply in exercising its discretion to determine that a forfeiture is excused.

Although the parties did not have the benefit of the *Thompson Street* decision in the Superior Court proceedings or when they filed their briefs in this court, the parties' briefs directly address forfeiture and the substantial coverage obligations that the insurers seek to avoid in this case. Principles of fairness should not allow the insurers to avoid addressing the analysis set forth in *Thompson Street* simply because the opinion was not issued before this appeal was briefed.[27] I therefore would reverse the Superior Court's decision granting summary judgment in favor of the insurers and remand this matter for further proceedings.

---

[26] *Thompson St.*, 2025 WL 1213667, at *10.

[27] Aearo paid premiums to secure coverage for the types of damages at issue in the underlying litigation, and Aearo's parent corporation paid substantial costs to defend and ultimately settle the claims. As currently alleged, Aearo is at least partially liable for those costs, which vastly exceeded the SIR. The insurers may have other coverage defenses, but they should not be entitled to avoid their contractual obligations on the basis of the SIR provisions without a complete analysis regarding forfeiture.

9